[S. F. No. 3421.   In Bank.—July 12, 1906.]

## J. A. KIMBALL, Respondent, v. F. A. McKEE, Appellant.

PUBLIC LANDS—GOVERNMENT SURVEY—JUDICIAL NOTICE.—The courts take judicial notice of the rules for making subdivisional surveys of public lands, of the uniform method of numbering and designating the sections and their smaller subdivisions, and that, under the laws of the United States and the regulations of the land office, no sales of public lands are made until the plat and field-notes of the subdivisional survey of the township in which they lie have been returned and approved and made matter of public record in the surveyor-general's office and in the land office, by certified copies thereof; and that the surveyors are required to mark the section corners with posts or monuments properly lettered, and to show by accurate field-notes the distance and bearing of

witness-trees from section and quarter-section corners and the natural features of the country.

ID.—OBJECT OF RECORD OF FIELD-NOTES—RELOCATION OF CORNERS BY PURCHASERS.—The purpose of the preservation of the field-notes with the plat as matter of public record in the office of the surveyor-general is to enable the purchasers of public lands whose patents describe the land as delineated on the approved plat, as well as their successors, to correctly relocate the section and quarter-section corners, where, by accident or design, the artificial monuments placed by the official surveyor have been removed or destroyed.

ID.—BOUNDARIES — COURSES AND DISTANCES CONTROLLED BY MONU-MENTS.—Courses and distances are controlled in the fixing of boundaries by visible monuments, unless there are other sufficient circumstances to corroborate the former; and this is especially true where the boundaries themselves are permanent and visible, such as the bank of a navigable river or the shore of an ocean.

ID.—ACTION OF TRESPASS — INCORRECT PRIVATE SURVEY — VERDICT AGAINST EVIDENCE.—In an action of trespass, where the verdict of the jury for the plaintiff was based upon a private survey which was manifestly incorrect and not in accord with the field-notes of the government survey, and it appears that the true location of the asserted trespass was on lands not belonging to the plaintiff, the verdict must be held against the evidence.

ID.—EVIDENCE—FIELD-NOTES OF RESURVEY.—In determining the bound-aries of a patent for public land, the field-notes of a resurvey of a boundary of the township, certified by the surveyor-general as a copy on file in his office, which are identified by the official plats as the field-notes on which the patent was issued, and which be-came in legal effect a part of the patent, were properly admitted in evidence, without the showing of any reason for making the resurvey.

ID.—LAST ACCEPTED SURVEY—PRESUMPTION.—Prior to the issuing of the patent the government could make any number of surveys, as its officers might direct; and the last accepted survey is presumed to be the one on which the patent was issued, where the contrary does not appear.

ID.—TESTIMONY AS TO LOCATION OF LANDMARKS.—The testimony of witnesses as to observed location of landmarks placed upon the premises claimed by plaintiff was properly admitted.

ID.—CROSS-EXAMINATION OF DEFENDANT—DETAILS OF SURVEY.—When defendant was called as a witness for plaintiff as to the location of a township line and corner with reference to a stake placed by plaintiff's surveyor, he could not be properly cross-examined by his counsel as to the merits of the details of plaintiff's survey, and of another survey made by a government surveyor.

ID.—IDENTIFICATION OF PLACE OF TRESPASS WITH PLAINTIFF'S SURVEY.—The testimony is admissible of a witness to the survey made for the plaintiff that he correctly pointed out the land belonging

to plaintiff according to his survey, to a witness who testified to the commission of the alleged trespass as being on plaintiff's land as so pointed out.

ID.—CROSS-EXAMINATION OF WITNESS TO PLEA OF TRESPASS—ACCURACY OF SURVEY.—It not appearing that the witness to the place of trespass claimed to know anything about the accuracy of the surveys, a question concerning said accuracy put to him on cross-examination was properly excluded.

ID.—IRRELEVANT REMARK BY COURT AS TO IMPEACHMENT.—Upon cross-examining such witness, where defendant's counsel repeated a question several times, and in answer to statements by the court, insisted upon the right to cross-examine him, it not appearing that he was seeking to impeach him, a remark by the court, "You have no right to impeach him," was irrelevant, and not prejudicial.

ID.—TESTIMONY OF PLAINTIFF—CORNERS OF SURVEY—CROSS-EXAMINATION.—Where plaintiff testified merely to seeing the corners set by plaintiff's surveys, and that he had pointed them out to a witness to the trespass, he could not be properly cross-examined as to the accuracy of the survey.

ID.—CONCLUSIONS OF WITNESSES NOT EXPERTS—ARGUMENTATIVE QUESTIONS.—Questions calling for the conclusions of witnesses who are not experts as to accuracy of surveys, and the location of land in relation thereto, and argumentative questions were properly excluded.

ID.—INSTRUCTION AS TO SURVEYS.—The court properly instructed the jury as to the finality of the last corrected survey upon which the patent for public land was based, and that if the plaintiff's survey accorded therewith, it was the duty of the jury to find for the plaintiff, and fix the amount of his damages.

APPEAL from an order of the Superior Court of Mendocino County denying a new trial. J. M. Mannon, Judge.

The facts are stated in the opinion of the court.

McGarvey & Bledsoe, for Appellant.

McNab & Hirsch, and Seawell & Pemberton, for Respondent.

BEATTY, C. J.—This is an action of trespass in which the defendant is charged with having stripped the bark from a large number of trees growing on plaintiff's land, described as lots 1, 3, and 4, in section 31, township 5 south, range 2 east, Humboldt meridian, and the southwest quarter of the southeast quarter of section 30 of the same township. The shaded portion of the accompanying map shows the position

of these lots in their relation to each other as well as in rela-
tion to the township lines and the principal natural objects
and artificial monuments delineated and noted on that portion
of the official map of the township survey, to which reference
must·be had in construing the patent and determining the
location of the land. The plaintiff, as successor in interest to
the original patentee, is the unquestioned owner of the lots
of land thus delineated and described, and the only serious
question in the case is as to their real boundaries on the
ground. Whether, in other words, the stripping of the bark,
which is·not denied, was done upon plaintiff's land·or upon
other subdivisions of the said section 31, or in an adjoining
section. The plaintiff succeeded in convincing the jury that
the defendant had trespassed upon his land, and was awarded
damages in the sum of five thousand dollars. The appeal by
the defendant is from the order of the superior court over-
ruling his motion for a new trial.

Part of Tp. 5., S.R. 2., E.H.M.

The cause was first submitted in Department, where the order of the lower court was affirmed. The opinion then rendered contains a very full and generally satisfactory discussion of numerous alleged errors in the rulings of the superior court upon objections to evidence, and in the instructions given to the jury, and with a few trifling exceptions, hereinafter noted, is here readopted as to those points. The rehearing, indeed, was granted only because we desired to consider more carefully the question whether the verdict of the jury was supported by the evidence, or to state the question more specifically, whether the plaintiff's land was correctly located by the survey upon which he rested his case. With the opportunity of examining and comparing the voluminous and somewhat confusing evidence contained in the record, in the light of the additional argument on that point, we are convinced that the location contended for by plaintiff, and upon which his case depends, was not correctly made, and that in this respect the verdict of the jury is wholly unsupported.

In disposing of its public lands the government causes them to be laid off into townships six miles square, bounded by meridian lines on the east and west and by parallels of latitude on the north and south. This, at least, is the ideal township, but owing to faulty location of the boundary lines or to proximity to the seacoast, or to both causes, as in this case, and to the convergence of meridian lines—as in all cases—a township never contains thirty-six sections each exactly a mile square, into which they are supposed to be divided. The rules for making the subdivisional surveys, however, are well understood, and there is a uniform method of numbering and designating the sections and their smaller subdivisions, of all of which matters the courts take judicial notice. Section 31 is at the southwest corner of the township, next on the east is section 32, and so on to section 36 at the southeast corner. We also take judicial notice that under the laws of the United States and the regulations of the land office no sales of public lands are made until the plat and field-notes of the subdivisional survey of the township in which they lie have been returned and approved, and that the patents issued to purchasers describe the lands patented as they are delineated on the approved plat—which remains a public record in the office of the surveyor-general, and copies

of which, officially certified, are deposited in the local land office. We also know that it is made the duty of the surveyors employed to make these subdivisional surveys to mark the section corners with posts properly lettered, or other monuments, and also the intersection of quarter-section lines with the section lines, and more especially to preserve accurate field-notes of their surveys showing the natural features of the country, such as streams, mountain ridges, the ocean shore, nature of the soil, whether barren or fertile, wooded or meadow; distance and bearing of witness-trees from section and quarter-section corners, etc.

These field-notes are, like the township plat, preserved in the office of the surveyor-general as a public record, and their principal purpose is to enable the purchasers of public lands and their successors to correctly relocate the section and quarter-section corners within the township when by accident or design the artificial monuments placed by the official surveyor have been removed or destroyed,—a very common occurrence, as the records of this court and the decisions of other courts abundantly prove.

And so in this case, when the plaintiff came to the conclusion that the defendant was collecting tanbark by stripping his trees, he found himself under the necessity of employing a private surveyor to find the corners of section 31, in which his land is situate. The evidence offered by him at the trial (the map and field-notes of the official surveyor) shows that these corners, as well as the quarter-section corners, were marked by posts or other monuments, properly lettered at the time of the survey, and many of them identified by the distance and bearing of witness-trees as well as by their relation to the shore of the ocean, the stream known as Whale Gulch, and the crest of the high ridge dividing that stream from the ocean. There is no evidence in the record that any search was made for the corner posts or witness-trees, which, if found, would have ended the question as to the true location of plaintiff's land. But assuming that the proper effort was made to find the corner posts and witness-trees, and that it was fruitless, the most obvious alternative was to trace the township line to its intersection with the line of ordinary high tide on the ocean shore,—that being the southwest corner of the township,—then measure 1.80 chains east from that point

and thence twenty chains north for the southeast corner of plaintiff's land, thence eighty chains on the same course for the northeast corner, thence twenty chains west for its northwest corner, thence south to the ocean shore, thence along the shore to a point due west of the southeast corner, and then close upon that.

This, indeed, is precisely what plaintiff's surveyor (Chapman) undertook to do, but did not do. There is a very serious question in the case, whether he ever found the line which bounds the township on the south. He places it in utter disregard of the field-notes and plat of the official survey, which he had in his hands and assumed to follow. But conceding for the moment that he may have found the true south boundary of the township, his method of tracing it to the ocean and his views as to what constitutes the shore of the ocean are most peculiar. The township plat and the field-notes of the official surveyor show that the trend of the ocean shore is from northwest to southeast for many miles north and south of the township line; that east of the ocean shore at a distance of 86.20 chains this line intersects a small creek (Whale Gulch) which flows south and empties into the ocean about one mile south of that point. Between this stream and the ocean is a high ridge rising from the shore at a very steep angle for a distance of 25.80 chains, more gently for about fourteen chains further and thence descending somewhat less abruptly than on the ocean side to Whale Gulch. Chapman, in order to find the intersection of the township line with the ocean shore, went over into Whale Gulch where he discovered an *"Old Settler"* who pointed out to him the quarter-section post on the south line of section 32. This corner, which, according to the plat and field-notes, ought to have been found twenty-five chains west of Whale Gulch, was at some distance east of that stream, but the "old settler" showed him a line indicated by "old blazes" on trees which led him to what he assumed to be the quarter-section corner, and having by this remarkable process located the quarter-section corner in defiance of the official plat and field-notes, he immediately falls back upon the same field-notes for the purpose of locating the ocean shore. They tell him that this quarter-section is 61.80 chains east of the shore, and therefore, of course, he has only to go that distance west from the

corner to find himself on the beach. He accordingly goes· due west to a point exactly·on the crest of the ridge which divides the watershed of the ocean from that of Whale Gulch, and, having measured the distance, finds that, by a happy coincidence, he is just 61.84 chains west of the "old settler" corner, and knows, therefore, that he is at the ocean shore, or, to be strictly accurate, that he is four links beyond it. .Here, again, he forgets his field-notes, which tell him that this ridge is at least 25.80 chains east of the shore line on the southern boundary of the township (and its summit, judged by the angle of ascent, about eight hundred feet above'the sea-level). He is not, however, daunted by a trifle like this, but plants his post to mark the southwest corner of the township right on the "crest of the ocean" or the "cone of the ocean" according to his own varied and picturesque terminology. Having fixed this point, the rest of his task is easy. He has only to measure twenty chains north and 1.80 chains east, to find the southeast corner of plaintiff's land; thence north eighty chains, west twenty chains, south to the intersection of a meander line somewhere east of the shore line, thence with its meanders to a point due west of the southeast corner and east till he closes on that point. This he proceeds to do, and the result is he has located plaintiff's land on the eastern slope of the ridge in Whale Gulch, when the field-notes of the official surveyor show that not only those subdivisions of section 31 belonging to plaintiff, but the whole section, extending twenty chains further east, are on the western slope of the ridge, looking down upon the ocean. And, of course, no portion of it touches the ocean shore, or comes any nearer the ocean shore than a point 1.80 chains east of the summit of the ridge. Mr. Chapman reconciles this discrepancy by assuming that the shore line of the township is coincident with the meander line by which it was measured, and he gratuitously assumes that the meander line was run along the summit of the ridge. There is not in the whole record any credible evidence to show that the meander line was so run, and in the absence of testimony the presumption is that it was run along the beach, if the beach was passable, and, if not, by some other method that would enable the surveyor correctly to locate the line of ordinary high tide,—that being the line to which the public surveys extend. There is no evidence that the beach north-

ward from the township line is impassable at any point, while it does affirmatively appear that south of the township line as far as the mouth of Whale Gulch it is passable, and that the same government surveyor (Perrin) who measured the west boundary of section 31 north of the line, also measured south as far as Whale Gulch, and that his measurements were made along the beach. Besides, the meander line is not itself the shore line. It is only a means of measuring and correctly locating the shore line. The survey itself extends to the line of ordinary high tide, and all the land included within that line passes to the patentee of the subdivisions shown to be so bounded by the township plat. Mr. Kimball, therefore, owns to the ocean shore on the south half of his claim. Nothing can stop him short of that natural boundary. Not even the government can come between him and the actual shore line. If, therefore, Mr. Chapman's survey is to prevail, he has made the plaintiff a present of a strip of land extending a half mile along the shore and as wide as the distance between the line of ordinary high tide and the summit of the dividing ridge between the ocean and Whale Gulch. And in doing this he has deprived plaintiff's coterminous owner on the east of a strip of equal width and a whole mile in length. I have said that there is no credible evidence to support the claim that the meander line of the seashore was run along the summit of the ridge. There was, on the contrary, conclusive evidence in Mr. Chapman's hands, at the time he chose to make that assumption, that it was not so run. He had the field-notes of Perrin, who ran the meander line of the shore to the township line and the township line eastward from the ocean as far as the quarter-section corner in section 34. He had also the field-notes of Foreman, who made the official subdivisional survey of the township, and whose field-notes of the township 'line correspond exactly with Perrin's,—one (Perrin) measuring from the west, and the other (Foreman) measuring from the east. Now, take Perrin's notes, commencing at the end of his meander line which was run for the sole purpose of locating the township line at its intersection with the ocean, they read as follows:—

"East, of corner, Tp. 5 s., R. 2 E., H. M. set post 4 ft. long, 4x4 in mound of rock 4 ft. base, 2 ft. high.

Cor., fractional sec. 31, from which cor. I run East on south boundary sec. 31.

Varia. 17 degs. 35 min. East.

Ascending steep rocky sides.

21.80 Set post 4 ft. long, 4x4 in mound of rock 8½ ft. base 2 ft. high, cor., Secs. 31 and 32 land rough and broken.

Soil 3rd. rate, rocky.

February 14th, 1876.

East, on south Boundary Sec. 32.

Vari. 17 degs. 35 mins. East.

Ascending steep rocky side

4.00 Top of slide and enter grassy opening

18.00 Ridge bears N. W. & S. E.

19.00 Enter brush

26.00 timber.

40.00 Mark leaning Madrona 10 in., dia. for ¼ sec. cor. from which a madrona 8 ins. dia., bears N. 18 deg. W., 46 lks. dist. a tan oak 8 ins. dia., bears S. 30 degs., W. 37 lks. dist. 64.40 Stream in deep gulch 10 links wide course South.'' Etc.

It will be observed that to mark the southwest corner of the township he sets his post not at, but east of, the corner, and this, for a reason sufficiently obvious. Set at the line of ordinary high tide, it would have been exposed to the wash of every spring tide, and with its mound of stones would have been obliterated by the first storm. Set east of the corner it exactly indicated the point of intersection of the shore and township lines—the true southwest corner of the township. Having thus established this corner, he proceeded to lay out the township line to the eastward. If he understood his duty (and a public officer is presumed not only to know, but to perform, his duty), he commenced his measurement at the true shore line, which is, indeed, the proper construction of his notes; for that corner of the fractional section 31 coincides with the southwest corner of the township. Wherever one is, the other necessarily is, and the notes clearly show that he ran east from the corner and not from the post which he set on the line east of the corner. But if it were conceded that he commenced at the post, and not at the corner, it would only be so much the worse for Mr. Chapman's deductions. Instead

of bringing the true shore line nearer to the summit of the
ridge, it would put it farther away, by just the distance
between the corner and the post. From whichever point he
measured he found that it was 21.80 chains to the common
corner of sections 31 and 32, and at least four chains farther,
on any construction of his field-notes, to the summit of the
ridge, where Chapman takes the liberty of locating the ocean
shore, and where he found some scattered stones, which he
concludes are the remains of the mound erected by Perrin to
mark the southwest corner of the township. Enough has been
said, I think, to demonstrate how absurdly fallacious were the
means resorted to by Chapman for locating the shore line of
the ocean,—a natural monument that locates itself,—how grat-
uitous his assumption that the meander line was traced along
the top and sides of a lofty ridge more than a quarter of a
mile from the beach, and how inconsequential that fact would
have been if it had been a fact.

Having no guide for the location of that part of the town-
ship line except the field-notes of Perrin and Foreman, which
exactly agreed as to such conspicuous natural monuments as
Whale Gulch, the summit of a high ridge, and the ocean shore,
he discards all these, in his search for a starting-point, in
favor of a stake pointed out by an old settler, more than a
quarter of a mile from the place indicated by the natural
monuments, and not otherwise identified, than by a line of
"old blazes on trees,"—a kind of mark not mentioned in any
surveyor's field-notes, and not explained or given any sig-
nificance by his own testimony or that of any other witness.
The genesis of this "old settler" corner will be shown when
we come to consider the York survey, evidence of which was
introduced for the purpose of corroborating Chapman, and
it will appear to be an extremely frail foundation for the
structure that has been reared upon it. At this point it is
sufficient to say that Chapman, by adopting it as the basis
of his survey, has made a location of plaintiff's land which
utterly falsifies every important feature of the official survey
which it was his duty to follow. An instance of its discrep-
ancies not before mentioned is the distance on his line, accord-
ing to his estimate (he did not take the trouble to measure it)
between Whale Gulch and the seashore. He testifies that it
was not more than five chains from his post on the ridge down

to the ocean, and only ten chains in the opposite direction to° Whale Gulch, making the total distance only fifteen chains. Foreman's field-notes and the approved plat show the true distance to be 86.20 chains. If his estimate of the distance is even approximately correct, his line must have been run within a quarter of a mile of the mouth of Whale Gulch—three quarters of a mile south of the true line as platted on the township map. It is probable, however, that he greatly underestimated the distance from the summit of the ridge to the ocean, for the shorter the distance the less the absurdity of making the summit the ocean shore. And all plaintiff's other witnesses on this point exceeded his estimate, one placing the distance at twelve hundred feet or over. If this witness was correct, Chapman's survey locates plaintiff's land a quarter of a mile away from the ocean, which by the official survey is the western boundary; if Chapman was correct his township line was located much too far south.

I have thus far discussed Chapman's survey with sole reference to the field-notes (Perrin's and Foreman's) by which he professes to have been guided. He had, it is true, the field-notes of another surveyor (Glover), but since his survey was altogether east of section 33, they did not touch section 31 or section 32, and could not possibly have aided Chapman at this stage of the proceedings. But after he had completed his survey of plaintiff's land by measuring it off and setting boundary posts at the corners and along the sides, he made a survey for another party to locate the southeast quarter of section 34, and in that connection ran some lines and made some measurements from one of Glover's corners which are supposed to corroborate the survey he made for plaintiff.

For the purpose of considering this part of plaintiff's case, it is necessary to give a brief outline of the proceedings of three official surveyors employed at different times in the survey of township 5 south, range 2 east, Humboldt meridian, and two adjoining townships. The history of these surveys is plainly written upon the face of the township plats, and in the field-notes from which they were compiled, copies of which were introduced in evidence by the plaintiff. Bearing in mind that in laying off townships to the east of the Humboldt base and meridian, those in range 1 east were naturally marked out before those in range 2, and that the meridian

line bounding range 1 on the east became necessarily the western boundary of range 2, it appears that this common boundary was established by the official survey of S. W. Foreman in 1874. By his survey, it was found that the length of the township line from the northeast corner of township 5 south, range 1 east, to the Pacific Ocean was three hundred and eighty-five chains, or, in other words, ninety-five chains short of six miles, and the plat shows that the established common corner of the two townships on the shore line (the southeast corner of 1 and southwest corner of 2) was just sixty-five chains south of the southeast corner of section 24 of township 5 south, range 1 east, Humboldt meridian.

In 1876, another surveyor (George H. Perrin) was employed to complete the subdivisional survey of township 24 north, range 19 west, Mt. Diablo base and meridian. The north boundary of this tier of townships in the Mt. Diablo system did not quite coincide with the south boundary of township 5 south of the Humboldt system. It seems that there was a space between them, and that Perrin was instructed to locate the south line of township 5 south, range 2 east of the Humboldt system in order to close his survey of township 24 north, range 19 west of the Mt. Diablo system upon that line. The method adopted by him for locating the southern boundary of township 5 south, range 2 east, was to start from the southern extremity of its western boundary at its intersection with the shore line of the ocean, and meander that line to a point ninety-five chains south of his starting-point. This was a perfectly correct method, and, since his measurements seem to have been carefully made, would have yielded a correct result if, unfortunately, he had not mistaken his proper starting-point. He commenced his meander line a little more than twenty chains south and a little less than forty chains east from the right point, and in consequence placed the township line a quarter of a mile too far to the south, and added a half mile to the west border of the township. The subdivisional survey subsequently made shows this. By reference to the map it will be seen that the western tier of sections (18, 19, 30, etc.) are thirty-eight and a fraction chains over a mile in width from east to west, and the common corner of sections 19 and 30 in 2 east, instead of coinciding with the common corner of sections 24 and 25 in 1 east, are

20.60 chains south of it. This mistake of Perrin's seems to have been the occasion of much of the confusion which has since arisen. He, however, unconscious of his error, proceeded to lay off the township line from the southern extremity of his meander line as far east as the quarter-section corner of section 34, and it is the field-notes of this survey to which reference has heretofore been made.

About a year after the completion of Perrin's survey of the township line, as far as the quarter-section corner in section 34, another surveyor. (J. R. Glover) seems to have been employed to continue that survey and establish the township line as far as the southwest corner of township 5 south, range 5 east. At all events, that is what he assumes to have done, as appears by a copy of his field-notes certified by the surveyor-general. But there is no evidence that any subdivisional survey was ever based on this survey of the township line. It was in 1883, six years after Glover's survey, that Foreman was employed to make the subdivisional survey of this township and to resurvey its east and south boundaries. This he did, and his survey was adopted and approved, and the land sold by reference to a plat compiled from his field-notes, a circumstance which puts Glover's survey and notes completely out of the case. They either conform to Foreman's notes or they do not. In the former case they are superfluous, in the latter incompetent, and only serve the purpose of further confusing an inquiry which is sufficiently confused without them. It is to Foreman's field-notes and the official plat that we must look for guidance in relocating the lost corners of the subdivisional survey, and whatever Glover did not only may, but must be, left out of the consideration, if it conflicts with what Foreman did. His survey was superseded by the resurvey. It could, at most, have the effect of corroborating the latter in some collateral way, but cannot be allowed to contradict it. The question is not where Glover put the township line, but where Foreman finally established it, and the only evidence we have of that is his field-notes, and the official plats of township 5 south, range 2 east, Humboldt meridian, and township 24 north, range 19 west, Mt. Diablo meridian, of which that township line is the common boundary. These show a perfect correspondence with Perrin's field-notes as to the western portion of the line—noting at the same distances

the seashore, Whale Gulch, section and quarter-section corners, and witness-trees.

To return now to the survey made by Chapman of the southeast quarter of section 34, and the measurements based upon that, by which he claims to have confirmed the correctness of his location of plaintiff's land: His testimony shows that he selected as the starting-point of that survey a corner described in *Glover's* field-notes. In other words, he prefers a corner established by a superseded survey to all the conspicuous landmarks noted in the later official survey, and the only conclusion is that, if he surveyed correctly from the point so selected, there is no correspondence between Glover's survey and Foreman's survey—a very probable supposition on other grounds; for Glover's method of locating the east end of Perrin's line, as described in his (Glover's) field-notes and the testimony of the witness Riley, was not such as to inspire much confidence in the result of his labors.

The first survey made for the purpose of locating plaintiff's land after the approval of Foreman's official survey, was made in 1894 by Richard York, county surveyor of Mendocino County, for Stewart, the original patentee and plaintiff's grantor. Evidence of York's location of the land was introduced for the purpose of corroborating Chapman's survey. York, himself, was not called as a witness, and his field-notes—which should have been on file in the county surveyor's office—were not produced; but Breeden and Howard, who as chainmen assisted in making the survey, testified from recollection as to the manner in which it was made, and that the location of plaintiff's land by York was practically identical with Chapman's location. But their testimony also showed that this survey corresponded with Chapman's only because, like Chapman's, it was based exclusively upon an erroneous location of the quarter-section corner of section 32. York's method of locating that corner was to start from the southeast corner of the township at a distance of four and a half miles to the east, and chain that distance on a course which the witnesses are unable to state. As to whether it was due west or only approximating that course, there is no competent evidence; and there is likewise no competent evidence that he started from the southeast corner of the township. Neither Breeden nor Howard pretends to be a surveyor, or to know

CXLIX Cal.—29

of his own knowledge that the point from which they commenced their chain measurement was the true southeast corner of the township. Howard says: "We started on the east line of 36; they [meaning, I suppose, York] called it the township line; I don't know; we found a post at the corner of 36, from that course we ran west clear to the ocean—the bluff," etc. Breeden's testimony upon this point is the same in effect as Howard's, except that he does not expressly state that he did not know of his own knowledge that the post from which York started was on the township line. Fairly construed, however, all the testimony as to this essential fact was pure hearsay. But, passing this objection, and allowing that the measurement was made from the true southeast corner of the township, the mode of locating the corner at or near the end of the measured course was contrary to law. There is nothing better settled by authority or statute than the rule that courses and distances are controlled in the fixing of boundaries by visible monuments, unless there are other sufficient circumstances to corroborate the former. (See Code Civ. Proc., sec. 2077, and *Miller* v. *Grunsky*, 141 Cal. 450, [66 Pac. 858, 75 Pac. 48].) And this is especially true when the boundaries themselves are permanent and visible, such as the bank of a navigable river or the shore of an ocean. As to the mode of locating this quarter-section corner of section 32, Breeden, who admits that he cannot remember the exact distances they ran except where they set or found corners, says that when they got to section 32 "we found a part of a stake or some object there, I don't know what it was; we found a stake having the appearance of a corner," etc. Howard says: "They found a stub there that they thought would prove to be a stake, the stake had been burned years before, it was so rotten you could not tell—*we set a stake there*, then we went on west to 31 and 32, and then we located Mr. Stewart's claim." This tells the whole story. Neither Breeden nor Howard knows whether York had any field-notes to guide him. If he had any, they were probably Glover's, as may be inferred from the fact that his survey co-ordinates itself with Chapman's survey from a Glover corner. Certainly, if he had Foreman's notes,—identical with Perrin's,—and the only notes he was at liberty to follow, he entirely disregarded them. They, if they had been consulted, would have told

him that the quarter-section corner of section 32 was marked, not by a stake, but by a leaning madroño tree ten inches in diameter, and by the distance and bearing of two witness-trees—a madroño and oak; that instead of being nearly a quarter of a mile east of Whale Gulch, it was more than a quarter of a mile west of it, and that instead of being nearly one hundred chains from the ocean shore it was only 61.60 chains from that imposing landmark. Here, then, was a corner located by course and distance alone, and absurdly out of relation to a fixed and unmistakable natural boundary, and to every monument and landmark called for in the field-notes of the official survey. A location of lost corners by a survey from a corner so established is utterly worthless; it is a survey made contrary to law. (Code Civ. Proc., sec. 2077.) York's survey, therefore, instead of corroborating Chapman's, merely serves to explain Chapman's mistake. It furnishes, as above intimated, the genesis of the "old settler" corner. For Howard testifies that they replaced the rotten fragment of a stake with a new stake; and that no doubt soon acquired among the neighboring settlers the reputation of being what it purported to be—the proper mark of that quarter-section corner. As such it was pointed out to Chapman who made it the basis of his survey without regard to mountain, stream, or ocean.

Plaintiff also called as a witness a Mr. Champagne, who had acted as a chainman for one Sandow in making a survey of plaintiff's land about two years before the trial. His survey assumed to start from the quarter-section corner between sections 20 and 21, and resulted practically in the same location as Chapman's. If Champagne knew of his own knowledge where the quarter-section corner between sections 20 and 21 was, his testimony would lend some faint support to plaintiff's case, but he does not say that he knew the corner—he saw a corner marked by a stake and a tree, but does not explain how it was identified as the corner which Sandow took it to be; and Sandow himself did not testify, having, as it is stated, left the country. Champagne's testimony, standing by itself, would leave it very uncertain whether Sandow really started from the quarter-section corner between 20 and 21, while the fact that his survey coincides with those of York and Chapman tends strongly to prove that he must have started

from another York corner established by him in surveying from a Glover corner, or from his erroneous location of the quarter-section corner of section 32. But whether this surmise is correct, or not, it is certain that the Sandow survey cannot impart vitality to one so fatally at variance with natural boundaries and monuments as Chapman's is.

The southwest corner of section 31 is the southwest corner of the township, and that is marked by the intersection of the township line with the shore of the ocean. To locate subdivisions of that section the survey should start from that corner, and if a survey from that corner locates them in one place, with their west boundary at the shore line, a survey starting from an interior quarter-section corner, nearly two miles distant from the nearest corner of section 31, which locates the same subdivisions in a different place and entirely away from the ocean shore, cannot be said to raise a substantial conflict. For, in the first place, a township corner is a monument of higher grade than any interior corner, and, in the next place, natural monuments—such as the shore of the ocean—which are incapable of being moved or mistaken, are always preferred to artificial monuments, and especially to artificial monuments at remoter distances.

In this review of the evidence, I have not forgotten the witness Burg, and I have not forgotten Perrin. Burg merely acted as axman for Chapman in making the survey from the Glover corner, which, as explained above, counts for nothing. Perrin was taken on the ground after the completion of Chapman's survey for the purpose of seeing whether he had correctly located the township line. He went on the ground twenty-five years after the survey, without his field-notes, and, looking at Chapman's stake at the summit of the ridge, concluded from his recollection of the topography that it was placed at or very near—practically at the same point—where he had set a post to mark the end of his meander line and the southwest corner of the township. This evidence given on his direct examination, it is needless to say was flatly contradicted by his own field-notes, as above quoted, and on his cross-examination he admitted over and over again that where his testimony differed from his field-notes his recollection was at fault. So that if, as he testified from recollection, he set his post at the end of his meander line to mark the southwest corner of the town-

ship, that line must have ended at least 25.80 chains west of the ridge, instead of directly on top of it, where Chapman's post was set, and must have been run, as I have assumed it was run, along or near the beach. The evidence of Perrin, so far from supporting Chapman, is directly against him, for at last he swears by his field-notes, and nothing confutes Chapman more completely than they do—corroborated as they are in every particular by Foreman's notes.

An important topographical feature to which frequent reference has been made is Whale Gulch. Its distance from the ocean and its relation to section and quarter-section corners have been extensively commented upon in the foregoing discussion of the evidence, and it would not be proper to omit all reference to the iterated and reiterated assertion of counsel for respondent, based apparently on Mr. Chapman's testimony, that neither Perrin nor Foreman mention or refer to Whale Gulch in their field-notes. It is somewhat surprising that counsel should have been so easily misled in so simple a matter; for the only basis of Chapman's claim that the notes do not mention Whale Gulch, is that they do not mention it *by name*. They both mention it—Perrin, as a stream in a deep gulch, ten links wide, course south; Foreman, as a small creek in a gulch running east. All the evidence in the case, including Chapman's own testimony, shows that this small stream, or creek, was Whale Gulch, and nothing else. The official map of the adjoining township on the south shows it at the same distance from the ocean on the township line that Foreman places it in township 5 south, range 2 east, Humboldt meridian, and also shows its course from that point to its mouth in the ocean. The photographs also put in evidence by plaintiff, and taken from a point near the mouth of Whale Gulch, corroborate the map. They show the relation of the gulch to the ridge, and to Chapman's stake. It was not necessary to give a name to the gulch in the field-notes, even if it had acquired a name at the dates of the surveys, which does not appear.

The fact has been mentioned that Perrin located the township line a fraction over twenty chains too far south. It is not to be understood that it can now be correctly relocated. For it appears that Foreman in his resurvey adopted Perrin's line and based his subdivisional survey upon it. He must have discovered at an early stage of the subdivisional survey the fact

that the township line was too far south, and to satisfy himself as to the source of the error, he carefully retraced the meander line of the ocean, and discovered, as his field-notes show, the error of Perrin in starting from the point "a" instead of the point "A" when he undertook to locate a point on the seashore ninety-five chains south of "A," which marks the southeast corner of township 5 south, range 1 east, Humboldt meridian. He, however, resumed his subdivisional survey on the line upon which he had started—Perrin's line—and completed it by closing on the eastern line of the adjoining township, adding, as the map shows, nearly a half mile to the western boundary of that which he was surveying. His field-notes of the survey of section 31—which correspond exactly with the official plat—show that he commenced at the common corner of sections 31 and 32 on the township line 21.80 chains east of the seashore, that he ran north forty chains, between sections 31 and 32 along a southwest slope, and there set a marked post and stone witnessed by two trees—at sixty chains he entered dense chaparral, at eighty chains he set a post to mark the common corner of sections 29, 30, 31 and 32, properly marked, and witnessed by four trees—giving distances and bearings. He describes the land along this course as mountainous, soil third rate, first half mile in open prairie, balance dense chaparral, scattering oak, and madroño. His notes as to the next course running west to the ocean, read as follows:

"As this line ends in the ocean in less than a mile I run

W. on true line bet. secs. 30-31

Var. 17 degs. 42 min. E.

Steep descent

40. Set a post 4 ft. long 4 ins. sq., 24 ins., in the ground with mkd stone for ¼ sec. Cor. in stone mound 4x2 ft. mkd. ¼ S. on N. face.

No tree in limits.

50.35. Intersect the Pacific ocean on station No. 3 of meanders in sec. 30 and set a post 4 ft. long 4 ins. sq., 24 ins., in the ground for cor., to fractional secs., 30, 31 mkd., T. 5 S., R. 2 E. on E. S. 30 on N. and S. 31 on S. faces; raises a mound of stones around post.

No trees in limits.

land steep W. slope
Soil 3rd rate
partly open grass land and partly dense chaparral."

These notes clearly show that the whole of the section was surveyed on the west slope of the ridge, that on its south boundary the section line was 21.80 chains and on its north boundary 50.35 chains from the ocean. Plaintiff's east line is twenty chains west of the east line of the section, and the south half of his west line is the seashore. In relocating the corners of this section these notes and their calls for natural monuments are not to be disregarded in favor of a quarter-section post in Whale Gulch, placed, as it appears, by County Surveyor York in utter disregard of every call in the official survey,—and upon no better evidence as to its proper location than a chain measurement of a course four and a half miles in length from a point assumed to be the southeast corner of the township by witnesses who do not pretend to be surveyors, and whose testimony upon that point is essentially hearsay.

It is urged by counsel for respondent that even conceding an error in Chapman's survey, and that plaintiff's land is west of his location, the verdict ought not to be disturbed, because there is evidence in the record that defendant peeled the trees on the western slope of the ridge. There is such evidence; but it also appears that while the growth of tan-oak east of the ridge is very abundant, there are but few trees scattered along certain ravines on the west slope, and the verdict for five thousand dollars was based upon proof of a large quantity of bark stripped from the trees in Whale Gulch. The verdict, therefore, is not supported by the evidence as to the comparatively trifling amount cut on the west slope.

The principal errors of the court in ruling upon objections to evidence consisted in admitting the testimony of Breeden, Howard, and Champagne as to the York and Sandow surveys, without sufficient preliminary evidence that they were made from correctly located starting-points. Minor errors need not be noticed in detail. In view of the foregoing discussion they are not likely to be repeated on a retrial of the issues.

The order denying a new trial is reversed and the cause remanded.

Henshaw, J., Harrison, J., and Lorigan, J., concurred.

SHAW, J.—I dissent. I think there is sufficient evidence to sustain the verdict under the rules applicable in this court.

NOTE.—Justice McFarland being unable to act, Justice Harrison, one of the justices of the district court of appeal for the first appellate district, participates herein *pro tempore*, pursuant to section 4 of article VI of the constitution.

The following is the opinion rendered in Department One, on the 4th of November, 1905, which was readopted on certain points by the foregoing opinion:—

SHAW, J.—The plaintiff sued the defendant to recover damages for an alleged trespass upon real estate belonging to the plaintiff. The trespass complained of consisted of stripping tanbark from a large number of oak trees growing upon the premises.

The land described in the complaint consisted of four government subdivisions contiguous to each other, and constituting a tract one mile in length from north to south, and one fourth of a mile in width, except at the southernmost part thereof, where the Pacific Ocean cut off one corner thereof. The three southernmost tracts lay in section 31, township 5 south, range 2 east, Humboldt meridian, and were described as lots 1, 3, and 4 of said section, being the lots corresponding to the west half of the northeast quarter, and the fractional northwest quarter of the southeast quarter thereof. The northerly tract constituted the southwest quarter of the southeast quarter of section 30. The principal contention upon the trial arose over the location of the land with reference to the government survey, and a large part of the evidence relates to the location of the monuments placed at the corners by the government surveyors and the topography described in the field-notes of the official survey. The appeal is from the order denying the defendant's motion for a new trial. Many objections and exceptions were taken to the rulings of the lower court upon the admission or rejection of evidence, and these are alleged as errors which require a reversal of the order.

The plaintiff derived title under a patent from the United States issued to John L. Stewart. The patent describes the subdivisions above mentioned, and refers to the official plat of

the survey of said land returned to the general land office by
the surveyor-general. A certified copy of this official plat was
introduced in evidence. It shows that the official survey of
the township in question consisted of separate surveys of dif-
ferent parts of the township, made by different surveyors at
different times. The west boundary was surveyed by S. W.
Foreman, under contract of June 24, 1874; part of the south
boundary was surveyed by G. H. Perrin, under contract of
January 26, 1876; the remaining part of the south boundary
was surveyed by J. R. Glover, under contract of November 13,
1876; and the whole of the south boundary was resurveyed
and the lines of the sections and minor subdivisions of the
township were surveyed by Foreman, under contract of Janu-
ary 13, 1883. It appears from the evidence that the survey by
Perrin of a part of the south boundary was done under a con-
tract for a survey of the township immediately south, being
township 24 north, range 19 west, Mount Diablo meridian, and
many of the so-called corners established by Perrin referred
to in the evidence are what are called "closing corners" made
by him in joining the survey in township 24 to that in town-
ship 5. A survey of plaintiff's land was made by Mr. Chap-
man, and the plaintiff's case depends on the accuracy of his
location of the southeast corner of section 31 and other corners
on the south township line from which the location of the
boundaries of plaintiff's land was determined. The defend-
ant claims that Chapman placed the boundaries about one
fourth of a mile from their true location. One of the principal
questions in the case was whether or not Foreman's survey
of the south township line was identical with Perrin's, and
whether or not Chapman found the true location according to
the intendment of the patent. Chapman in his survey at-
tempted to follow the lines as shown by the field-notes of the
Foreman survey rather than those of the Perrin survey. The
time of the issuing of the patent is not given in the record, or
at least our attention is not called to it, but it is manifest from
the evidence that it was issued after the making of all the
surveys and the acceptance thereof as shown on the official
plat.

The objection to the introduction of the field-notes of sur-
veyor Foreman showing the resurvey of the southern boundary
of the township was properly overruled. These field-notes

were certified by the surveyor-general as a copy of the field-notes of Foreman on file in his office, and the official plats sufficiently identify them as the field-notes on which the patent was issued. They, therefore, became, in legal effect, a part of the patent (if no pre-emption or homestead rights have intervened, and none appear here) which constituted the plaintiff's title, and were properly admitted in evidence. (*Chapman* v. *Polack,* 70 Cal. 487.) It was not necessary to show any reason for the making of the resurvey. Prior to the issuing of the patent the government could make any number of surveys, as its officers might direct, and the last accepted survey is presumed to be the one on which the patent was issued, unless the contrary appears.

The various objections made to the admission in evidence of the field-notes of the Glover survey and of the action of the court in allowing references to be made to the field-notes of Foreman are disposed of by the remarks already made concerning the authenticity of these surveys. They each constituted a part of the survey of the township in which the land was situated, and for the purpose of locating the land it is proper to refer to either or both of them so far as they would aid in fixing the landmarks and boundaries.

Two witnesses, Breeden and Howard, testified that they were present and assisted one Richard York, county surveyor, in making a survey of the land in question, some eight years before the trial. Objection was made to these references to the survey of York upon the ground that there was no competent evidence that any such survey was made, nor that, if made, it was accurate or correct. If these witnesses had been called to prove the survey of York, this perhaps would have been an error, but it is manifest from their whole testimony that this was not the purpose. They were asked to testify with relation to certain landmarks which were found in the course of the survey and which they were as competent to observe and describe as any other person, and the point of this part of their testimony, so far as it was material, consisted in the fact that these landmarks to some extent corresponded with those mentioned in the survey of the plaintiff's land made by Chapman, which last-mentioned survey was introduced in evidence. Their testimony as to the existence of the landmarks some eight years before the trial

was some corroboration of the later survey by Chapman. It was also admissible to show that they were familiar with the lines of the land in question according to the theory of the plaintiff,—that is, with their location, as fixed by the survey of Chapman. This familiarity was necessary as a foundation for further testimony by Howard concerning the damage done to plaintiff's land by the stripping of the bark from the timber thereon.

The defendant was called as a witness by the plaintiff, to testify to the fact that if the south boundary of the township was extended west from the established corner between sections 34 and 35, it would pass near to the stake established by Mr. Chapman, the plaintiff's surveyor, as the southeast corner of section 31, in which the plaintiff's land is situated, and to the additional fact that the quarter-section corner between sections 20 and 21 in the same township was a well-known corner and marked by well-known visible monuments. Upon cross-examination by the defendant's counsel, he was asked a number of questions which called for facts, or for his opinion concerning facts, affecting the respective merits of the two surveys, that alleged to have been made by Mr. Perrin of the south boundary of the township on the one hand, and claimed by the defendant to be conclusive as to the location of the land, and that made by Mr. Chapman for the plaintiff on the other hand, and which, according to the plaintiff's claim, established the corners so as to cover the land upon which the defendant committed the trespasses. These questions were objected to as not proper cross-examination, and were excluded by the court. There was no error in this. While some of the preliminary questions put to the defendant on examination-in-chief referred to these surveys, it was plainly not the object or purpose of the testimony elicited from him by the plaintiff to prove any facts except the two above mentioned—the location of a line extended west from the corner of section 34 with respect to the Chapman stake, and the well-known character of the quarter-section corner between sections 20 and 21. The defendant had not the right, upon the cross-examination concerning these facts, to go into an extended cross-examination with reference to the details of the respective surveys. Two of these questions objected to called for a description of the place where the stake of Chapman was set as the southeast

corner of section 31 and of the objects which were visible from that point. If there had been any dispute concerning the location of this stake, this evidence might have been properly admitted, but as matter of fact there never was any question or doubt concerning it. The dispute was not as to the actual location of this stake on the ground, but as to the place where it should have been located according to the official government survey. The exclusion of this testimony, even if erroneous, could have caused no substantial injury.

Complaint is made of the action of the court in allowing a witness to testify concerning a survey made by one Sandow. The objection was that there was no competent evidence of any such survey, and that it was not proper to prove its accuracy or its existence by the testimony of those who assisted in making it. The testimony, however, was competent for the purpose for which it was introduced. The witness assisted Mr. Sandow in making the survey, and saw and observed the landmarks located by Mr. Sandow. Some of these were mentioned also in the original government survey. He subsequently assisted the plaintiff's surveyor, Mr. Chapman, in making a resurvey and relocation of the land, and upon that occasion saw many of the same landmarks. The corner from which Sandow started in making his survey was the quarter-section corner between sections 20 and 21, which was the same corner which the plaintiff himself testified was a well-known and well-marked corner. The witness testified to the courses and distances, run from thence, under his own observation, by Sandow, to the land in dispute, and his testimony tended to show that the correct measurement and course from that corner, according to the government survey, would locate the land in substantially the same place as that established by Chapman's survey, and, consequently, it would tend to corroborate the accuracy of Chapman's survey, and to show that it corresponded with the quarter-section corner which the defendant testified was well established. He testified to what he saw, and not to statements made by Sandow. It was therefore competent and relevant testimony.

The testimony of the witness Burg was properly admitted for the purpose of identifying the land subsequently testified to by Pryor. Pryor was called to testify concerning the commission of the trespass complained of, and he stated in a pre-

liminary way that the particular land concerning which he testified was pointed out to him by Burg as the land belonging to the plaintiff, according to the survey made by Chapman. It was proper, therefore, to prove by Burg that he correctly pointed out the land to the witness Pryor. As the witness Pryor did not pretend to know anything about the accuracy of the surveys, the question put to him concerning the same was correctly excluded. A good deal is said in argument concerning a remark made by the court after questions to Pryor had been repeated several times by defendant's attorney. The defendant's attorney, in answer to some statements by the court, said, "I have a right to cross-examine the witness," to which the court said, "You have no right to impeach him." This is the remark complained of. We do not think the action of the court was so serious as to require a reversal of the case. It is true that counsel was not endeavoring at that time to impeach the witness, and the remark of the court, if it was properly taken down, appears to have been irrelevant. We cannot perceive how it could have done substantial harm to the defendant's cause.

The complaint made concerning the refusal of the court to permit the extended cross-examination of the plaintiff Kimball with respect to the details of a survey made by Chapman which he witnessed is without foundation. In his examination-in-chief the plaintiff had merely testified that he saw Mr. Chapman set the corners of his land, and that he afterwards pointed out the same corners to one George Howard, who subsequently testified concerning the trespass complained of. The cross-examination was properly excluded for the reason given in regard to the cross-examination of the witness Burg,— namely, that the witness had not, in his testimony-in-chief, claimed any knowledge of the accuracy of the Chapman survey, and that he was not called for the purpose of proving its accuracy.

There was no error in the instructions given by the court at the request of the plaintiff. The instructions complained of were as follows:—

1. "I charge you that the government of the United States can make a new survey and change and correct an older or erroneous survey while the land affected thereby remains government land; and after the acceptance by the land depart-

ment of the correcting survey, the latter becomes the authorized and official one.''

3. ''I charge you that any corner or monument established by Perrin in his survey of 1876 was, so far as the land situated in twp. 5 south, range 2 east, H. M. is concerned, superseded by the corresponding corner or monument established or used by Foreman in his survey of 1883, if the latter survey disagrees with the former in relation thereto.''

4. ''I charge you that while it is true that the United States government can change or correct the surveys of its lands as it may see fit while the same remain government lands, after they are disposed of to settlers or purchasers, the last surveys made for, and accepted by, the land department before the disposal or purchase, is final and unchangeable; and any surveyor, who for private parties thereafter undertakes to re-establish or relocate lines or corners, should endeavor as nearly as possible to follow in the footsteps of the surveyor who made the last accepted government survey and place the corners and lines where they were placed by him.''

5. ''If you should find from all the evidence in the case, that Foreman in his survey in 1883, did not use the same line or the same location of corners run and established by Perrin in 1876, yet as to all the lines and corners which were not run or established by Perrin at all, but by Foreman only, the survey of Foreman must govern without regard to the question whether or not he used the same line on the south boundary of the township, which was used by Perrin.''

7. ''If you find from all the evidence in the case that the township surveyed by Perrin and that surveyed by Foreman were so surveyed by them respectively that the lines thereof overlapped yet the survey of Foreman must be followed in the township surveyed by him.''

11. ''I charge you that if you find from the evidence that Chapman, the surveyor, fixed the lines of plaintiff's lands substantially in accordance with the Foreman survey of 1883, it is your duty to bring in a verdict in favor of the plaintiff, J. A. Kimball, and fix the amount of damages in accordance with instructions heretofore given.''

The official plat which was introduced in evidence was not in any way impeached or contradicted. It established the fact beyond controversy that the original survey of part of the

south boundary of township 5 by Perrin was resurveyed by
Foreman in 1883, and this being the case, the survey by Fore-
man would control in all disputes concerning the identity of
the land included in the government patent subsequently
issued.   There was no evidence that any settler or purchaser
had acquired any rights in the land in question between the
time of the two surveys.  It is probable from the evidence that
the survey of township 24 made by Perrin in 1876 overlapped
to some extent the survey of township 5 made by Foreman in
1883.  But this fact cannot avail the defendant in his defense
to this action.  He does not claim any land in township 24
under the Perrin survey or any other survey.  His defense con-
sisted entirely in an attempt to show that the land upon which
he stripped the timber of its bark was not the land patented
to the plaintiff's predecessor, Stewart.   From the evidence
there can be no controversy over the fact that the subdivisions
patented to Stewart were the subdivisions as surveyed and
located by Foreman by the survey of 1883.   That survey is
therefore the one which must control the location of the land
in question.   Wherever that survey conflicts in any respect
with the previous survey made by Perrin of the township to
the south thereof, the Foreman survey must be considered as
having superseded all previous surveys with respect to the
land in township 5.   The land of the plaintiff did not at any
point touch the southern boundary of the township in which
it was situated.   Its location was controlled entirely by the
corners and lines of the interior subdivisions as established by
the Foreman survey.   The only purpose which the Perrin sur-
vey could serve in establishing the location of the land was
that of a check to the survey made by Foreman, and to aid in
ascertaining the true location of the latter.   The true location
of the Foreman lines, however, when ascertained, establishes
the location of the interior subdivisions of the township, re-
gardless of any discrepancy that may exist between said lines
and the south boundary of the township as established by
Perrin, even if we should admit that the resurvey of that
boundary by Foreman was not controlling.   We do not think
that the instructions complained of assume the existence of any
fact which is not conclusively established by uncontradicted
evidence, or by the law regarding official surveys of the United
States government.   Some complaint is made that the instruc-

tions given at the request of the defendant are inconsistent with those given by the plaintiff. Upon examining them, however, we do not think that the inconsistency exists.

Objections were sustained to a number of questions put by the defendant in cross-examination of plaintiff's witnesses and in the examination of his own witnesses, upon the ground that they were not in proper form. Many of these questions called for the conclusions of the witnesses who were not experts concerning the accuracy of the surveys and the situation or location of the land with respect thereto, and were incompetent for those reasons. Others were argumentative in form, and were properly rejected for that reason. It is not necessary to prolong this opinion to discuss errors of this character. The principle that questions of such form are improper is well established.

The last point made by the defendant is that the evidence is insufficient to justify the verdict. We have examined it, and are satisfied that there was abundant evidence in support of the plaintiff's case. The question is squarely presented whether the survey of Chapman made by the plaintiff indicated the correct location of the land in controversy. There was evidence sufficient to show that it did, and the contradictory evidence, such as it was, would have scarcely been sufficient, if taken alone, to justify a contrary conclusion.

The order is affirmed.

Van Dyke, J., and Angellotti, J., concurred.