Filed 8/27/14  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JACQUES BLOXHAM et al., | H038040 |
| | (Santa Cruz County |
| Plaintiffs, Cross-defendants and Appellants, | Super. Ct. No. CV159793) |
| | |
| v. | ORDER MODIFYING OPINION |
| | |
| TODD SALDINGER et al., | |
| | |
| Defendants, Cross-complainants and Appellants. | |

BY THE COURT:

The opinion, filed on August 1, 2014, is modified as follows:

On page 5, footnote 4, delete the first two sentences and replace them with the following two sentences:

"The Saldingers' property includes three parcels of land, the largest being Parcel One. The other two parcels of land are much smaller and irregularly shaped; they fill in gaps between Parcel One and other properties."

This modification does not affect the judgment.

The petition for rehearing is denied.

Dated:_____          _____

                                                                      ELIA, J.

_____

RUSHING, P. J.

1

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JACQUES BLOXHAM et al., | H038040 |
| Plaintiffs, Cross-defendants and Appellants, | (Santa Cruz County Super. Ct. No. CV159793) |
| v. | |
| TODD SALDINGER et al., | |
| Defendants, Cross-complainants and Appellants. | |

Jacques Bloxham (or Jack Bloxham) and Janette Magoc (the Bloxhams) and Todd Saldinger and Barbara Saldinger, also known as Barbara Zylbert,[1] (the Saldingers) disputed the location of their common property lines. At trial, the determinative issue was the location of the western boundary of the Shoquel Augmentation Rancho (more recently denominated the "Soquel Augmentation Rancho"; hereinafter sometimes "Rancho"), a line roughly seven miles long. The deed descriptions of the parties' parcels at issue called to that western boundary line of the Rancho (hereinafter "Rancho line").

The exterior boundaries of the Rancho were surveyed by United States Deputy Surveyor John Wallace in 1858, and the plat of the Rancho specified that it encompassed over 32,702 acres. The corners, or termini, of the Rancho line are SA-2 (at the southerly end) and SA-3 (at the northerly end). The parties' surveyors reached different conclusions about the location of the Rancho line and the parties' common boundaries.

---

[1] For the sake of clarity, we will refer to Barbara Zylbert as Barbara Saldinger in this opinion.

1

Following a court trial, which included a judicial view of the property, the court quieted title in favor of the Bloxhams.  On appeal, the Saldingers contend that the survey done by their surveyor, Stanley Gray, was sufficient as a matter of law because it "sufficiently" utilized the original 1858 survey, while the survey done by the Bloxhams' surveyor, Paul Jensen, was insufficient as a matter of law because it did not.  We find no basis for concluding that Jensen's 2009 survey, upon which the Bloxhams relied at trial, was insufficient as a matter of law.

In a cross-appeal, the Bloxhams maintain that the trial court abused its discretion by denying their motion to recover their cost of proving the location of the common boundary lines of the parties' properties based on Barbara Saldinger's failure to admit a request for admission (See Code Civ. Proc., § 2033.420, subds. (a) & (b)).  We find no abuse of discretion.

Accordingly, we affirm the judgment.

I

*Procedural History*

The Bloxhams filed a verified complaint alleging causes of action for trespass, quiet title, and injunctive relief.  The Saldingers cross-complained.  Their verified second amended cross-complaint asserted causes of action for quiet title, slander of title, trespass, and injunctive relief.

The case was tried to the bench.  In addition to the evidence presented in the courtroom, the judge visited Soquel Creek, a redwood "witness tree" stump toward the southerly end of the Rancho line, a redwood "line tree" stump located near the properties in dispute, the disputed area, and the Laguna Sarjento at the northerly end of the Rancho line.  The trial court determined that the Bloxhams' surveyor, Jensen, "tied back" to the original federal survey, and "the location of the Rancho line as shown by Jensen is correct."  It concluded that the Bloxhams' Parcel Four was senior to the Saldingers'

2

property and, consequently, the Bloxhams' Parcel Four "must be located first along the Rancho line before determining where the junior parcel, the Saldinger property, is located" and "[a]ny overlap must be resolved in favor of Bloxham."

After trial, the Bloxhams filed a motion for an order awarding costs of proof in the amount of $123,196.58 for the failure of defendant Barbara Saldinger to admit facts in response to a request for admission (see Code Civ. Proc., § 2033.420). The ground for the motion was that defendants "had no reason to deny that the boundary between the litigants' property was as claimed by plaintiffs." The Saldingers opposed the motion. By order filed August 29, 2010, the trial court denied the motion.

The court's statement of decision and judgment in favor of the Bloxhams with respect to quiet title, slander of title, and injunctive relief was filed on February 14, 2012.[2]

## II

### *Appeal*

A. *Background*

The Bloxhams own real property, which includes Parcel Four, off Laurel Road. The Del Dot family sold the first parcel of their lands, now Bloxhams' "Parcel Four," to the Bloxhams' grandparents, the Chabres. The Bloxhams' property now includes approximately 28 to 30 acres.

Predecessor owners of the Saldingers' property, the ones who built the house on the property, planted a line of cedar trees in the disputed area as a privacy screen. The trees roughly marked the boundary line but there was never an agreement as to the exact boundary line. In about late November 2004, Jack Bloxham discovered an excavation, approximately 50 feet by 60 feet, west of the trees at the north end of the line of trees.

---

[2] The parties indicate in their briefs that they agreed to dismiss their trespass causes of action.

3

Jensen, a professional land surveyor for roughly 26 years, surveyed the Bloxhams' property and testified on their behalf at trial. Martin Marcott, a professional land surveyor licensed since 1975 and former Santa Clara County Surveyor, testified as an expert on behalf of the Bloxhams.

Gray, a professional land surveyor licensed since 1992, surveyed the Saldingers' property and testified on their behalf at trial. Walter Robillard, an attorney and member of the Georgia bar, a registered land surveyor, and a forester, testified as an expert on behalf of the Saldingers.

B. *Bloxhams' Parcel Four and Senior Rights*

The parties' properties are located in Santa Cruz County east of Highway 17. The Bloxhams' Parcel Four and the Saldingers' "Parcel II" (hereinafter "Parcel Two") share common boundaries and both parcels are described in their respective grant deeds with reference to the Rancho line and each parcel's description begins and ends at a station on the Rancho line.[3] The Bloxhams' Parcel Four is quadrilateral shaped and shares a

---

[3] The grant deed description of Bloxhams' Parcel Four provides: "Being a part of the lands conveyed by Albert C. Schaeffer, et al., to Peter D. Del Dot and Laura Del Dot by Deed Recorded February 28, 1944, . . . and further described as follows: [¶] Beginning at a station on the southwest line of said lands, *being also the southwest line of the Rancho Soquel Augmentation from which the most western corner of said lands of Del Dot bears north 28° 30' west 502.0 feet distant*; thence along the southwest line of said lands of Del Dot, north 28° 30' west 502.0 feet to said most western corner; thence along the northwest line of said lands of Del Dot, north 45° 30' east 260.0 feet to a station; thence leaving last mentioned line and running parallel to first mentioned line, *south 28° 30' east 390.0 feet* to a station; thence *south 25° 11' 22" west 310.13 feet* to the place of beginning." (Italics added.) The grant deed description of the Saldingers' Parcel Two provides: "Part of the said land conveyed to Peter D. Del Dot and Laura Del Dot, . . . and further bounded and described as follow: [¶] *Beginning at a station on the Westerly boundary line of the Soquel Augmentation Rancho*, from which the intersection of the said boundary line and the County Road known as Laurel Road bears South 28° 30' East 617.33 feet distant, the said station being also the Northwest corner of the land of Riedel; thence North 28° 30' West 33.00 feet to a station; thence *along the Southeasterly line of the lands of Louis J. Chabre bearing North 25° 11' East 310.13 feet* to a station; thence *North 28° 30' West 177.32 feet* to a station; thence leaving the last mentioned course and

4

common boundary along its southerly boundary and part of its easterly boundary with the Saldingers' Parcel Two, which the Saldingers describe as a "small, hockey-stick-shaped parcel" located between the Bloxhams' Parcel Four and their "Parcel I" (hereinafter "Parcel One").[4] The parties agree that the location of the Rancho line determines the common boundaries of their properties.

At trial, there was no dispute that the Bloxham's Parcel Four enjoys senior rights over the Saldingers' property. Gray, the Saldingers' surveyor, explained, as to senior rights, that "[i]n a meets [*sic*] and bounds legal description, the parcel that's senior gets [its] full width and length, and if there is an overlap the junior parcel would give way to the senior parcel." A respected treatise states: "If a grantor conveys part of his or her land, he or she cannot at a later date convey more than his or her remainder. The first buyer has what is known as senior rights, and the second buyer has junior or remainder rights. The senior buyer is entitled to all land conveyed to him according to his description; the junior buyer is entitled to all land conveyed to him, provided it does not interfere with the senior rights. If such interference occurs, the junior deed loses." (3 Miller & Starr, Cal. Real Est. (3d ed. 2011) § 8:72.)

At trial, Jensen acknowledged that, in this case, senior rights did not alter the location of the parties' disputed common boundaries once they were properly determined with respect to the Rancho line.

## C. *Original Official Survey of the Rancho Line*

At trial, Jensen confirmed that a golden rule of surveying is "to follow . . . the footprints of the original surveyor." The parties essentially agree that Wallace's 1858

---

returning on itself bearing South 36° 30' East 192.50 feet to a station; thence South 25° 11' West 343.00 feet to the place of beginning." (Italics added.)

[4] The Saldingers' property is composed of three parcels, the largest being Parcel One. The other two parcels are much smaller and irregularly shaped; they fill in gaps between Parcel One and other properties. The Saldingers' Parcel One and the Bloxhams' Parcel One also call to the Rancho line.

"final survey of the Rancho Shoquel Augmentation, Martina Castro, Confirmee," fixed the location of the Rancho line.[5]

Under California law, the location of a disputed boundary line is proven by retracing, as nearly as possible based upon existing evidence, the footsteps of the original surveyor whose survey fixed the boundaries. (See *Pauley v. Brodnax* (1910) 157 Cal. 386, 396-397 [" 'The survey as made in the field and the lines actually run on the surface of the earth . . . must control.' [Citation.]"]; *Kimball v. McKee* (1906) 149 Cal. 435, 462 [Trial court correctly instructed that " '. . . . any surveyor, who for private parties thereafter undertakes to re-establish or relocate lines or corners, should endeavor as nearly as possible to follow in the footsteps of the surveyor who made the last-accepted government survey and place the corners and lines where they were placed by him.' "]; *Yolo County v. Nolan* (1904) 144 Cal. 445, 448-449 ["[A later surveyor] should endeavor to retrace the steps of the man who made the original survey. If by so doing the line can be located, it must be done, and, when so located, it must control."]; *Harrington v. Boehmer* (1901) 134 Cal. 196, 199 ["The question in all cases similar to this is, where

---

[5]  We assume that the exterior boundaries of the Rancho were surveyed by Wallace under a decree of confirmation and the land was patented by the United States in conformity with Wallace's field notes. "To fulfill its obligations under the Treaty of Guadalupe Hidalgo, under which California became a part of the United States, Congress enacted the Act of March 3, 1851, to ascertain and settle land claims in California. The act required persons claiming right or title in lands from the Spanish or Mexican governments to present their claims to a commission for settlement. Following a decree of confirmation by the commission, the land was surveyed by the Surveyor General and a map of the survey prepared. Thereafter, on proof of confirmation and approved survey to the General Land Office, the federal government issued a patent to the claimant. The patent issued on confirmation of a land grant 'was conclusive of both (a) the validity of the grant . . . and (b) the land's boundaries. *U.S. v. Coronado Beach Co.* (1921) 255 US 472. . . .' [Citations.]" (*Aptos Seascape Corp. v. County of Santa Cruz* (1982) 138 Cal.App.3d 484, 503; see *Summa Corp. v. California ex rel. State Lands Com'n* (1984) 466 U.S. 198, 202-203 [104 S.Ct. 1751].)

6

were the lines run in the field by the government surveyor?  A government township lies just where the government surveyor lines it out on the face of the earth."].)

In *Weaver v. Howatt* (1911) 161 Cal. 77, a quiet title action, the issue was the location of the boundary line between the parties' lands.  (*Id*. at pp. 78-79.)  They shared a "common section line," which was "fixed by the official survey of the United States, from whom both parties derive[d] title."  (*Id*. at p. 79.)  The Supreme Court stated: "It is for the trial court, upon all the evidence, to fix the [common sectional corner] at a point where it will best accord with the natural objects described in the [original] field-notes as being about it, and found to exist on the ground, and which is least inconsistent with the distances mentioned in the notes and plat."  (*Id*. at p. 86.)

In this case, more than 150 years have passed since the original survey.  Neither surveyor found any original corner monument set by Wallace at either SA-2 or SA-3 as described in his field notes of the 1858 survey.  Both surveyors claimed to have ascertained, as nearly as possible based upon Wallace's field notes and other evidence, the location of the Rancho line.

D.  *Standard of Review*

On appeal, the Saldingers argue that Jensen's survey was insufficient as a matter of law.  The Bloxhams counter that the substantial evidence rule governs.

"[T]he question presented to the court in a boundary dispute is not that of making a resurvey but one of determining as a question of fact from the preponderance of expert and nonexpert evidence (as in all other civil cases) the actual location of the monuments, corners or lines as actually laid out on the ground by the official surveyor."  (*Chandler v. Hibberd* (1958) 165 Cal.App.2d 39, 55.)  "The questions where the line run by a survey lies on the ground, and whether any particular tract is on one side or the other of that line, are questions of fact.  *Russell v. Land Grant Co.*, 158 U. S. 253, 259, 15 Sup. Ct. 827, 39 L. Ed. 971."  (*U.S. v. State Inv Co* (1924) 264 U.S. 206, 211 [44 S.Ct. 289].)

7

"Surveyors and civil engineers, like other experts, may give testimony on questions involving matters of technical skill and experience with which they are peculiarly acquainted. [Citations.]" (*Richfield Oil Corp. v. Crawford* (1952) 39 Cal.2d 729, 741.) The weight and credence to be given an expert's testimony is a question for the trier of fact. (See *Estate of Schluttig* (1950) 36 Cal.2d 416, 424.)

In *Curtis v. Upton* (1917) 175 Cal. 322, two surveys conflicted. The California Supreme Court stated: "[I]t was the duty of the court to ascertain, if possible, the true position of the corner, accurately, if it could be done, or approximately within reasonable limits if the exact position could not be ascertained with absolute certainty. *Weaver v. Howatt*, *supra*, 171 Cal. 307 . . . ; *Weaver v. Howatt*, 161 Cal. 86 . . . . The Richardson survey was, of itself, evidence of the actual position of the true corner; obviously, it was more convincing to the court below than that of Dodge. It was the duty of the court to decide the question of fact in accordance with its own views of the preponderance of the evidence." (*Id*. at p. 333.)

In *Luginbuhl v. Hammond* (1960) 179 Cal.App.2d 350, the principal question on appeal was whether the court could accept the testimony of respondents' surveyor, Parrott, that an irrigation ditch constructed and maintained by respondents did not trespass on the appellant's land. (*Id*. at pp. 351-352.) The "[a]ppellant's surveyor, Bumgarner, testified the ditch did trespass." (*Id*. at p. 352.) On appeal, the appellant asserted that "the trial court erred in accepting the testimony of respondents' surveyor, in that his survey was not according to established legal rules." (*Ibid*.) She contended that the corner reestablished by the respondents' surveyor Parrott, "using the proportional method, was improper since the line could be established from the calls and monuments." (*Ibid*.) The appellant further argued that the testimony of surveyor Parrott was "based upon legally erroneous grounds and should be ignored and eliminated and that when this

8

is done there would be no substantial evidence to support the trial court's conclusion." (*Id*. at p. 353.)

The appellate court responded: "Appellant's chief criticism of Parrott's testimony is upon that portion which states that he established the north corner as being 200 feet west of a ravine, whereas the field notes called for a point 100 feet west of the ravine. Appellant argues that the ravine was a natural monument and could not be disregarded by Mr. Parrott in establishing the 'North Corner,' and that his testimony be ignored and disregarded because it was based on erroneous grounds. However, Mr. Parrott gave his reasons for establishing the corner 200 feet west of the ravine, and we believe it was for the trial court to weigh and evaluate his testimony." (*Luginbuhl v. Hammond*, supra, 179 Cal.App.2d at p. 354.) The appellate court noted that the trial court "heard and observed the witness and also viewed the premises." (*Id*. at p. 355.) It affirmed the trial court's judgment, stating that "[i]ssues of fact must be determined in the trial court." (*Ibid*.)

In reviewing the evidence for its sufficiency, "all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible." (*Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.) "It is an elementary, but often overlooked, principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact]. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford v. Southern Pac. Co.*, *supra*, 3 Cal.2d at p. 429; see *Chandler v. Hibberd*, *supra*, 165 Cal.App.2d at p. 60.) "The fact that it is possible to draw some inference other than that drawn by the trier of fact is of no consequence. [Citation.]" (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.) These rules apply "in reviewing the

9

findings of a judge as it is when considering a jury's verdict." (*Estate of Bristol* (1943) 23 Cal.2d 221, 223.)

The Saldingers do not attack the sufficiency of the evidence to support the court's judgment except insofar as they assert that Jensen's survey was legally insufficient as a matter of law. We disagree.

E. *Jensen's 2009 Survey Not Shown to be Contrary to Law*

Citing *Saunders v. Polich* (1967) 250 Cal.App.2d 136, the Saldingers maintain that, "on the essentially undisputed facts, the governing law did not permit the trial court to find in favor of [the Bloxhams]" because Jensen failed to locate the Rancho line with reference to the 1858 field notes of the original survey and the plat of that survey. In *Saunders v. Polich*, the testimony of the plaintiff's surveyor indicated that "he did not commence his survey from any known point established by a prior official government survey . . . ." (*Id.* at p. 141) "[H]e admittedly failed to locate or utilize any markers or monuments established, as section corners or otherwise, by the last official government survey of this region." (*Ibid.*) The plaintiff's surveyor apparently relied upon "a point established by a Department of Highways freeway survey" without comparing "the Department of Highways' field notes to those of the official survey." (*Id.* at pp. 141-142.) The appellate court concluded that the "survey was insufficient as a matter of law, and the judgment must, in consequence, be reversed." (*Id.* at p. 142.)

This case is distinguishable because Jensen's 2009 survey did not completely disregard the original 1858 survey. Both surveyors in this case claimed to have utilized proper surveying principles and methodology and located, within reasonable limits, the Rancho line as originally surveyed. We discern nothing more than conflicts in the evidence, which the trial court resolved adversely to the Saldingers.

The Saldingers first point out that Jensen, in preparing his 2007 Record of Survey, did not consider Wallace's 1858 survey of the Rancho. Jensen admittedly did not see the

10

field notes of the 1858 survey until his deposition and he did not identify any original survey points in his 2007 survey. At trial, however, the Bloxhams relied upon Jensen's 2009 Record of Survey.

The Saldingers next direct us to Jensen's 2009 declaration, which was executed prior to his 2009 survey for purposes of opposing the Saldingers' pretrial motion for summary judgment. In his declaration, Jensen attempted to "tie back" to the original federal surveys, and indicated that the Rancho line followed a different course than shown in his 2007 Record of Survey and was approximately 16 feet to the east of where he had first placed it.[6] At trial, Jensen no longer thought his declaration was correct. Jensen explained that his declaration had been based in part upon Gray's map but he subsequently determined that Gray had misidentified a "bearing tree" described in Wallace's field notes. When Jensen went into the field and did additional work, he found the remains of the true bearing tree and he concluded that the location of the Rancho line was consistent with his 2007 survey.

The Saldingers emphasize that Jensen's 2009 survey "did not depart in any material way" from his 2007 survey. It is not altogether surprising that Jensen's 2009 survey was essentially consistent with his 2007 survey, although the earlier survey was more limited in that Jensen did not attempt to locate SA-2 or SA-3. In preparing his 2007 survey, Jensen considered the survey of George Darling, recorded in 1982. The Darling survey retraced M.V. Bennett's 1870's retracement survey of the Rancho line between station 11 and station 16, southeast of the parties' properties. A retracement is a retracing of an original line.

The notes on Darling's Record of Survey referred to Wallace's original 1858 federal survey of the Rancho and the 1866 field notes of Alexander McPherson. The

---

[6]     Nevertheless, even in this declaration, Jensen determined that the disputed trees were located entirely on the Bloxhams' property.

11

notes indicated that McPherson surveyed the exterior boundaries of Township 9 South, Range 1 West, he "reran" the western line of the Rancho, and he marked a "closing corner" on the south boundary of section 34 and the Rancho's west boundary.

In preparing his 2009 Record of Survey, Jensen considered evidence of the location of the Rancho line described in Wallace's 1858 field notes. Those field notes indicated that, upon verifying the former location of the "Pala de la Yesca punk tree" (punk tree), Wallace placed a large redwood post on that spot, he then made Soquel Creek the boundary (SA-2), and he ran the Rancho line from the creek through the former punk tree's location to the Laguna Sarjento. According to those field notes, the stake at the original spot of the punk tree was on a course "N. 31 W," 13.50 chains from SA-2.[7] The field notes described a bearing tree: "A redwood 3 feet diameter" bearing "north 72 west 220" from the stake. Wallace's field notes also indicate a line tree, a "[s]trike redwood tree 3 feet diameter on side hill face west," on a course "N. 31 W," 397.55 chains from SA-2.

Jensen testified to identifying in the field the stumps of those two trees, which had been logged, based upon their markings. The 58-inch diameter stump of the redwood bearing tree had a blaze; the 46-inch diameter stump of the redwood line tree had a notch on its southwest side.[8] The location of the notch on the stump of the line tree was significant to Jensen because he could conclude, within reason, that the Rancho line ran through the tree. The stump of the line tree was just about "100-and-something feet south of Laurel Road," the southern boundary of the Bloxhams' and Saldingers' properties.

---

[7]     Early surveyors used chains to measure distance. A chain was 66 feet long and included 100 links. Each link was 7.92 inches. The original federal surveyors were paid by the mile.

[8]     Jensen testified that a tree is blazed by a surveyor on the side facing the reference point, which in this case was the punk tree. Jensen described a "strike" as basically a notch, which is usually smaller than a blaze. He stated that a notch is a horizontal chip out of the tree about the size of an ax head.

12

The trial court's judgment indicates that the judge viewed those trees and impliedly found Jensen's testimony credible.

The Saldingers claim that Jensen did not have the expertise to identify the stumps as being the remains of a bearing or line tree on the Rancho line. At trial, Jensen testified that, based upon the appearance of the logged stump, how old it looked, and how much its notch had filled in, he believed the stump of the tree he identified as a line tree was a three-foot redwood tree back in 1858. The Saldingers' counsel objected on the ground that Jensen had been qualified as a surveyor but not as an arborist or a forester. The court impliedly overruled the objection, indicating that Jensen was stating his belief as a surveyor based on his observations of the tree and its location. The Saldingers present no legal authority establishing that a professional surveyor may not opine whether he believes that a particular tree is a bearing or line tree based upon its aged appearance, location, and markings.[9]

Jensen established the former location of the punk tree on the Rancho line by measuring from the stump of the bearing tree that he identified, holding "record bearing and distance" as described in Wallace's field notes.[10] Holding the bearing and distance between the point of the former punk tree and SA-2, Jensen calculated the location of

---

[9] Counsel for the Saldingers was free to cross-examine Jensen regarding his opinion, which he did. Jensen later confirmed that it would be necessary to know the age of a tree when logged to determine whether its present diameter was consistent with having a three-foot diameter in 1858. He conceded he was not a trained arborist.

[10] At trial, Jensen criticized Gray's identification of an 84-inch merged, double redwood tree as the bearing tree to the punk tree on the Rancho line because the original notes did not call for a double tree. In addition, there was no blaze on that tree. Jensen also criticized Gray for using a 22-link distance between the bearing tree and the point of the punk tree instead of 220 links because the original 1858 field notes specified "220." Bennett's field notes of his 1870's retracement survey of the Rancho line confirmed the original distance of 220 links, specifying "a redwood faced as described in the original notes" at 2.20 chains distant. Jensen did not believe the tree identified by Gray was the bearing tree to the punk tree on the Rancho line.

13

SA-2.[11] Jensen's 2009 Record of Survey indicated that he searched for but did not find any monument marking SA-2.[12]

In *Ayers v. Watson* (1891) 137 U.S. 584, the United States Supreme Court stated that "the beginning corner of a survey does not control more than any other corner actually well ascertained, and that we are not constrained to follow the calls of the grant in the order said calls stand in the field-notes, but are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the land embraced would most nearly harmonize all the calls and the objects of the grant." (*Id*. at p. 604.) It found that "the judge was entirely right in charging [the jury] that the footsteps of the original surveyor might be traced backward as well as forward, and that any ascertained monument in the survey might be adopted as a starting-point for its recovery." (*Id*. at p. 590.) "The location of the monuments placed in connection with the original survey is of primary importance; monuments control over courses, distances, lines and angles. Code Civ. Proc. § 2077; *Weaver v. Howatt*, 161 Cal. 77, 80 . . . ; *Trabucco v. Sorrels*, 113 Cal.App. 401, 403 . . . ; *Kimball v. McKee*, 149 Cal. 435, 450 . . . ; *de Escobar v. Isom*, 112 Cal.App.2d 172, 175 . . . ; *Gordon v. Booker*, 97 Cal. 586, 588 . . . ; *Phelps v. Pacific Gas & Elec. Co.*, *supra*, 84 Cal.App.2d 243, 248 . . . ." (*Verdi Development Co. v. Dono-Han Min. Co.* (1956) 141 Cal.App.2d 149, 153.)

---

[11] On appeal, the Saldingers do not suggest that the difference between Gray's placement of SA-2 and Jensen's placement of SA-2 had any material effect on the determination of the parties' common property boundaries. Both surveyors found the Rancho line ran through a tagged half-inch iron pipe north of SA-2 and south of the point of the former punk tree.

[12] Wallace's 1858 field notes stated: "Set stake and pile of stone on small bar in middle of creek marked stake S.A. No. 2." A note on Gray's Record of Survey recognized that the exact position of SA-2 on the bar in the middle of Soquel Creek was not known since the creek's "waterflow & geology have changed over the last 151 years."

14

Wallace's 1858 field notes indicated that the course of the line running from SA-2, through the stake at the original spot of the punk tree, to Laguna Sarjento was "N. 31 W." Jensen indicated that later surveyors discovered an actual angle point on the ground, a deflection from the straight line indicated in Wallace's field notes, at the point of the former punk tree, and Jensen held this angle point in the Rancho line.[13]

The 1866 federal survey executed by United States Deputy Surveyor Alexander McPherson found an angle point at the original location of the punk tree on the Rancho line ("N. 28° 30' W."), as did Bennett's 1870's retracement survey ("N 28° 45' W"). In his research, Jensen found that an angle point at the punk tree was also reflected in a grant deed's description of property that borders the Rancho line at the punk tree.

Marcott indicated that surveyors used the local stakes set on the Rancho line and tied into those local points when the land was conveyed shortly after the Rancho line was run. Gray indicated that there were "long-standing lines of occupation" in the vicinity of SA-2 and he acknowledged that Jensen's angle point "more closely approximates the occupation running down to the creek in this area."

In Jensen's opinion, the point of the former punk tree, "controlled by the found bearing tree," was more significant than SA-2 in this case. The original 1858 field notes referred to the former punk tree, this was an angle point on the Rancho line, and that point was closer than SA-2 to the parties' properties.

Jensen considered the Darling's retracement survey of Bennett's 1870's retracement of part of the Rancho's western boundary, between station 11 and station 16, to the southeast of the parties' properties. Darling's retracement survey found the Rancho line ran "N 28° 52' 30" W" from station 11. From the location of the former punk tree, Jensen tied to three monuments on the Darling survey. Jensen explained that Bennett performed a more accurate survey than Wallace. In Jensen's opinion, Bennett's

---

[13]    Jensen described an angle point as a change in direction.

references to stakes in his field notes indicate that Bennett was finding Wallace's original stakes as he progressed, noting the chains to stakes, and labeling those stakes as stations.

Jensen tied the Rancho line to the stump of the redwood line tree that he located to the north of the area retraced by Darling. In Jensen's opinion, the distance measured from SA-2 to the stump of the redwood line tree matched up, within reason, with the distance of 397.55 chains reported in Wallace's field notes. This line tree confirmed his Rancho line.

Jensen considered the Edmundson survey of lands to the north of the parties' disputed common boundaries. Jensen tied to an untagged monument, a half inch capped iron pipe, called to be on the Rancho line by a number of documents, including the Edmundson survey, a county engineering map, and "deed documents."[14] Jensen thought the monument was on the Rancho line even though it could not be directly traced to the original survey.

Jensen acknowledged that tying to the Edmundson monument resulted in a very slight deflection of 38 seconds in the Rancho line compared with the course of the Rancho line established using monuments on the Darling survey. The standard compasses used in the 1850's generally were accurate to a quarter of a degree or 15 minutes but they could not measure a smaller deflection. Surveying parties worked in line segments, which each might involve a quarter degree of error and the error could accumulate. Robillard, the Saldingers' expert, confirmed that, in the 1850's, compasses were capable of measuring accurately to a quarter of a degree, which meant that there could be a discrepancy of plus or minus 15 minutes or 900 seconds. On the evidence before it, the trial court could reasonably conclude that a 38-second deflection from a

---

[14]     Jensen indicated that an "untagged point" is a monument lacking a land surveyor's license number or the civil engineer's registration number.

straight line was de minimis[15] and the stump of the redwood line tree to the south of the Edmundson monument corroborated Jensen's Rancho line.

The Saldingers argue that the stumps of the bearing tree and line tree did not establish Jensen's reliance upon Wallace's 1858 survey because they were "irrelevant as a matter of fact" to his "determination of the disputed portion of the Rancho line and, consequently, his determination of the disputed boundary line." They assert that the Rancho line identified by Jensen actually consisted of "line segments" and the trees had no effect on the line segment relevant to their property dispute. The Saldingers have failed to show that any deflections in the Rancho line to the north of the stump of the redwood line tree found by Jensen were more than de minimis, especially given the accuracy of surveying in the 1850's. Moreover, they do not argue, and present no legal authority, that evidence of line trees or bearing trees called in an original survey of a line are irrelevant to its location. The stumps of those trees, which the trial court impliedly found were the trees called in the original survey, were not "irrelevant" to the court's evaluation of Jensen's opinion as to the location of the Rancho line. " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

The Saldingers contend that Jensen "did not 'utilize' the 1858 Federal Survey in crucial part" because the crucial part of the Rancho line, from which the common boundaries of their properties were determined, "ran from the northernmost of Darling's monuments (to the south) to Edmundson's one monument (to the north)" and the

---

[15] Jensen testified that if he had merely extended the Rancho line north of Darling's survey in a straight line, the alignment would have been different by four inches at the southeast corner of the Bloxhams' property (south of the parties' disputed common boundaries) and eight inches at the northeast corner of the Bloxhams' property (north of the parties' disputed common boundaries). Robillard, the Saldingers' surveying expert, indicated that a four-inch discrepancy was probably de minimis.

17

Edmundson monument was not a point recorded by the original survey as being on the Rancho line. The Saldingers overlook the stump of the redwood line tree found by Jensen between those points. In any event, the Saldingers have not shown any error of law.

" 'Lines actually run and marked on the ground may be proved by any evidence, direct or circumstantial, competent to prove any other disputed fact, and where markers of the original survey have been destroyed, secondary evidence as to the authenticity of their relocation is admissible.' California recognizes these rules to be sound." (*Chandler v. Hibberd*, *supra,* 165 Cal.App.2d at p. 55.) The Saldingers have not provided legal authority establishing that a monument "called to be on the Rancho line by common report" of a number of documents could not be considered by surveyor Jensen in locating the Rancho line established by the original survey.

Wallace's field notes recorded the distance from SA-2 to SA-3 as 562.00 chains. They described SA-3 as being on a "northeast point of Laguna Sarjento" and recorded that Wallace "set a post marked S.A. No. 3, on north bank of Laguna." At trial, Jensen described Laguna Sarjento as "a bean-shaped lagoon" with a gentle "northerly slope." Gray described it as kidney shaped. Gray and Robillard, the Saldingers' expert, both indicated that the Laguna Sarjento runs north-south almost parallel to the Rancho line.

Jensen indicated that the best evidence that he had for the location of SA-3 was the 1866 compiled map of Township 9 South, Range 1 West, Mount Diablo Meridian, which showed the "sectionalized land" bordering part of the "Rancho Shoquel Augmentation" and tied to corner SA-3. The map was based on field notes of surveys on file in the Surveyor General's Office, including field notes of Wallace's 1858 survey and Alexander McPherson's 1866 surveys. McPherson's field notes of his 1866 survey of the "Exterior Meander and Subdivision of Township 9 South[,] Range 1 West[,] Mount Diablo Meridian," indicated that he retraced the Rancho line. McPherson's field notes of his

18

1866 survey of the "Subdivision & Meander lines of Township 9 South[,] Range 1 West[,] Mount Diablo Meridian," reported that a post was set at the quarter section corner, running north between sections 20 and 21.[16] The field notes indicated that McPherson proceeded one chain further and set a post at the Soquel Augmentation "grant line." Jensen indicated that this showed McPherson found the intersection between the Rancho line and the section line. McPherson's notes recorded his setting of a post on the northern line of the "Soquel Augmentation Rancho" at a specified distance on the section line and stated the bearing and distance from that point to the northeast corner of "Laguna Sargiento." Jensen indicated that McPherson in effect tied to SA-3.

Jensen surveyed in the field with a crew at the nearest quarter section corner to SA-3. Using the 1866 federal survey, Jensen could calculate the "locus area," but not the precise point, of SA-3, because surveyors in 1866 used a compass and chains, which led to discrepancies in distance and angles.

Walter Robillard, the surveying expert who testified on behalf of the Saldingers, explained that the federal government surveyed land in the public domain to create sections, townships and ranges and tied to existing federal surveys. When asked whether the 1866 survey honored the seniority of the 1858 survey, Robillard stated, "In my belief they did by the recognition in the field notes."

Jensen attempted, but was unable, to find the actual post marked SA-3 or any physical evidence of SA-3. Jensen calculated the position of SA-3 based on ties to the

---

[16] "The rectangular system of surveying was adopted by the federal government in 1785. This system generally provides for townships six miles square, containing 36 sections, each approximately one mile square." (Cal. Real Prop. Sales Transactions (Cont. Ed. Bar 4th ed. 2010) § 11.17, p. 948.) "Sections are commonly subdivided into quarters or halves, and this quartering or halving may be carried down into further quarters or halves." (Cal. Real Prop. Sales Transactions (Cont. Ed. Bar 4th ed. 2010) § 11.21, p. 953.) Jensen indicated that a post set midway between section corners at the half-mile point was designated a "quarter corner" because it divided a section into quarters.

federal government's "sectionalized land" surveys and located SA-3 about 50 to 75 feet off the Laguna Sarjento on a slight northerly slope that he took as a northerly bank.[17] That vicinity matched the terrain calls of the 1858 field notes. Jensen pointed out that the point identified by Gray as SA-3 was less consistent with the overall length of the Rancho line than Jensen's locus of SA-3.[18]

Jensen indicated that the best he could do was determine the locus or vicinity of SA-2 and SA-3. In Jensen's opinion, the loci he determined for SA-2 and SA-3 "fit within reason"- that is, they were within 10 to 15 feet of the original locations.

---

[17] In locating SA-3, Gray relied on Baldwin's and Hale's map of the 1929-1930 survey of the Hihns' lands. That map contained a notation with reference to SA-3 to the northwest of the Hihns' lands: "Iron pipe set at site of old Post SA-3 for Northwest Corner of Rancho Soquel Augmentation." Gray did not find the pipe. Marcott, the Bloxhams' expert, considered Baldwin's notation regarding SA-3 to be ambiguous because the "normal wording" would be "I found a 4-by-4 post and replaced it with one-quarter inch iron pipe or one-half inch iron pipe." The notation was susceptible of the interpretation that the iron pipe had been placed in the general area of SA-3 rather than in a specific location. Gray put SA-3 some feet off the east bank of the Laguna Sarjento, approximately midway along its length paralleling the Rancho line. That location did not match the 1858 field notes' terrain calls to the "north bank" on the "northeast point" of the lagoon. Gray's location of SA-3 missed the tie to the 1866 federal land survey by approximately 200 feet. Gray's Record of Survey showed the Rancho line extending in a straight line ("S 28° 12' 39" E") from the point he identified as SA-3 to the point he identified as SA-2. Jensen stated that Gray's erroneous location of SA-3 caused Gray's Rancho line to increasingly deflect toward the west as one moved from SA-2 toward SA-3. Jensen criticized Gray's Rancho line for leaving a gap between the Bloxhams' property and the MacDonalds' lands (to the northeast), which should not exist. Marcott also concluded that Gray had failed to locate Bloxhams' Parcel Four first with reference to the Rancho line which caused the Bloxhams' parcel to shift north.

[18] Both Jensen and Gray agreed that the Rancho line as measured in the field with today's instruments was shorter than reflected in Wallace's field notes. Jensen found that the Rancho line was actually about 1000 feet shorter. Gray found that the line was approximately 1100 feet shorter than reported. Jensen pointed out that Gray's calls were not consistently short but rather his call to his location of the former punk tree on his Rancho line was long.

20

Jensen concluded that SA-2 and SA-3 were "lost corners" because, in his opinion and based on the information he had, those corners could not be reestablished without reasonable doubt.[19] Jensen did not think they were "obliterated corners" as defined by the Manual of Surveying Instructions.

The Saldingers lastly assert that the "lost corner doctrine" does not excuse Jensen's "failure to utilize the 1858 survey." They also argue that "under governing law" the trial court erred in finding corners SA-2 and SA-3 to be "lost" corners rather than "obliterated" corners.

The phrases "lost corner" and "obliterated corner" are surveying terms of art. According to Jensen, an "obliterated corner" is a corner that can be established beyond a reasonable doubt even though the corner and its accessories have been lost. That is not true for a "lost corner." Robillard, the Saldingers' expert, testified that an "obliterated corner" is a corner for which "the evidence of the original survey has been destroyed or is missing but whose position can be located by the acts and testimony of interested landowners, competent evidence, necessary records in order to show where the corner was actually located on the ground by the creating surveyor."

California cases recognize: " 'A lost corner is a point of a survey whose position cannot be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position, and whose location can be restored only by reference to one or more interdependent corners.' (Manual of Surveying Instructions 1947, § 360. See also *Chandler v. Hibberd*, 165 Cal.App.2d 39, 52 . . . .) [¶] 'If there is some acceptable evidence of the original location that position will be employed in preference to the rule that would be applied to a lost corner.' (Manual of Surveying Instructions, § 360.)" (*Reid v. Dunn* (1962) 201

---

[19]     Jensen indicated that he could do quite a bit more work and this was the reason for his uncertainty about the exact locations of SA-2 and SA-3.

21

Cal.App.2d 612, 614; see *Finley v. Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 695, fn. 1 [defining "lost corner"].)

"In *Reid v. Dunn* (1962) 201 Cal.App.2d 612 . . . , the court discussed at length the various methods of relocating an obliterated corner and pointed out that such a corner could not be deemed a 'lost' corner justifying a resort to the proportionate measurement method unless there was no possibility of locating the original corner on the ground. The court pointed out that under section 355 of the Manual of Surveying Instructions, a corner was merely obliterated and not lost if its location had been perpetuated or the point for the corner could be recovered beyond reasonable doubt by the acts and testimony of interested landowners, competent surveyors, other qualified local authorities or witnesses. Likewise, under section 360 of said manual, the corner would not be treated as lost if there was some 'acceptable evidence' of its original location ([*Id*. at] p. 614 . . .)." (*State of California v. Thompson* (1971) 22 Cal.App.3d 368, 378.)

In *Yolo County v. Nolan* (1904) 144 Cal. 445, a quiet title action, the issue was whether a mile-long, 20-foot-wide strip of land was part of the east half or part of the west half of the west half of a section. (*Id*. at p. 446.) The Supreme Court stated that "the rule as to restoring lost corners by putting them at an equal distance between two known corners has no application, if the line can be retraced as it was established in the field." (*Id*. at p. 448.)

In *Weaver v. Howatt*, *supra*, 161 Cal. 77, a quiet title action mentioned above, the trial court determined that the monuments set by the United States surveyors at the common corner of four sections and quarter section corners had disappeared and those corners were lost corners. (*Id*. at pp. 79-80.) It concluded that the whole line had to be remeasured and divided into four equal parts "without regard to the government survey." (*Id*. at p. 80.)

22

The Supreme Court determined in *Weaver* that the trial court had improperly applied the proportional method of locating corners: "While it is true that the errors in the field-notes and plat make it impossible to locate the exact spot fixed by the official survey as the common corner of [four sections], in the absence of the monument set to mark it, yet there is ample evidence to show that it was not fixed at or near the place selected by the court, upon its theoretical subdivision of the line. It is not the province of the court to determine where the corner should have been fixed. This is not an action to vacate the government survey. It must be assumed that the line was measured and the monuments set. Their positions, as set, fix the rights of the parties, regardless of the inaccuracy of the measurements and the errors in distance found in the field-notes. The trial court must ascertain, as near as may be, where this monument was set by the government surveyor. If the exact spot [of a section corner] cannot be found, [the court] must, if possible, decide from the data appearing in evidence its approximate position, and the proportional method is to be used only when no other reasonable method is possible and it must be so used that it does not contradict or conflict with the official data that are not impeached, and which, when not impeached, confine the actual position within certain limits." (*Weaver v. Howatt*, supra, 161 Cal. at p. 84.) In a subsequent appeal in the same case, the Supreme Court stated that even if "[a]ll trace of that [corner] monument has disappeared, and the exact place where it was erected cannot now be identified," those "circumstances do not destroy the survey nor justify the court in disregarding it, when enough can be ascertained therefrom and identified on the ground to approximately locate the corner." (*Weaver v. Howatt* (1915) 171 Cal. 302, 307.)

As indicated by our previous discussion, Jensen sought to locate, as nearly as he was able to ascertain under the circumstances, the Rancho line as run on the ground by Wallace, the original surveyor. Jensen testified that he was able to determine the loci of corners SA-2 and SA-3 and his 2009 Record of Survey reflects those corners. Neither

23

Jensen nor the trial court applied any rule for restoring lost corners. Subsequent to judgment, the trial court explained that it found it "had to rely on other physical evidence that went back to the federal survey" because the SA-2 and SA-3 were "lost corners." Consequently, even if the two corners of the Rancho Line, SA-2 at the southern end and SA-3 at the northern end, should not have been deemed "lost corners" as that phase is technically understood by surveyors, we fail to discern any resulting prejudice.

The Saldingers have failed to establish that Jensen's location of the Rancho line in his 2009 survey was contrary to law. As stated, they do not otherwise challenge the sufficiency of the evidence to support the court's judgment. The court impliedly found that Gray had not located the true SA-2 and SA-3 corners and Jensen's opinion as the location of the Rancho line was more persuasive.

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' (*People v. Thornton* (1974) 11 Cal.3d 738, 754 . . . .)" (*People v. Maciel* (2013) 57 Cal.4th 482, 519.) These appellate rules of review apply to the testimony of expert witnesses as well as that of lay witnesses. (*Daly v. Wallace* (1965) 234 Cal.App.2d 689, 693.)

As the reviewing court, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citations.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Substantial evidence supports the trial court's judgment.

24

*Cross-Appeal*

A. *Background*

The Bloxhams cross-appeal, claiming that the trial court abused its discretion in denying their request for costs of proof for the Saldingers' failure to admit one of the Bloxhams' written requests for admission. Barbara Saldinger was requested to admit "[t]he boundary lines between plaintiffs' property and defendants' property are *accurately described by the plaintiffs' deed.*" (Italics added.) About a year before trial, the following response was given to the request for admission: "OBJECTIONS: Request is not full and complete in and of itself. C.C.P. § 2033.060(d). Further, defendants lack the information or knowledge sufficient to allow them to admit or deny the Request in that the Request calls for expert witness testimony and, as such, is untimely expert witness discovery. Based on the foregoing objections, the Request is denied." After trial, the Bloxhams requested $123,196.58 for their costs of proving the location of their properties' common boundaries.

The court denied the motion. It indicated that there were reasonable grounds for refusing to make the admission because the critical issue was the location of the Rancho line. The court also mentioned that the former owner of the Saldingers' property had indicated in her deposition that she was informed that the trees had been planted on her property and she refused to permit them to be cut. Further, the court made clear that, even if it had found that there were no reasonable grounds for denying the admission, the Bloxhams were not entitled to "the entire time and costs" to prepare for trial.

B. *Governing Law*

A written request for an admission may request a party to "admit the genuineness of specified documents, or the truth of specified matters of fact, opinion relating to fact, or application of law to fact." (Code Civ. Proc., § 2033.010.) "A request for admission

may relate to a matter that is in controversy between the parties." (*Ibid*.) Ordinarily, "[a]ny matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action . . . ." (Code Civ. Proc., § 2033.410, subd. (a).)

An answer in response to a request for admission must "[s]pecify so much of the matter involved in the request as to the truth of which the responding party lacks sufficient information or knowledge." (Code Civ. Proc., § 2033.220, subd. (b)(3).) "If a responding party gives lack of information or knowledge as a reason for a failure to admit all or part of a request for admission, that party shall state in the answer that a reasonable inquiry concerning the matter in the particular request has been made, and that the information known or readily obtainable is insufficient to enable that party to admit the matter." (Code Civ. Proc., § 2033.220, subd. (c).)

A party to an action may not necessarily avoid responding to a request for admission on the ground that the request calls for expert opinion and the party does not know the answer. (See *Chodos v. Superior Court for Los Angeles County* (1963) 215 Cal.App.2d 318, 322-323 [defendants claimed request for admission "call[ed] for an expert opinion as to engineering practice" and, "as lay property owners," they could not express an opinion].) "[S]ince requests for admissions are not limited to matters within personal knowledge of the responding party, that party has a duty to make a reasonable investigation of the facts before answering items which do not fall within his personal knowledge. (*Lindgren v. Superior Court* (1965) 237 Cal.App.2d 743, 746 . . . ; *Chodos v. Superior Court* (1963) 215 Cal.App.2d 318, 323 . . . .)" (*Smith v. Circle P Ranch Co.* (1978) 87 Cal.App.3d 267, 273.)

"Requests for admissions . . . are primarily aimed at setting at rest a triable issue so that it will not have to be tried. Thus, such requests, in a most definite manner, are aimed at expediting the trial. For this reason, the fact that the request is for the admission

26

of a controversial matter, or one involving complex facts, or calls for an opinion, is of no moment. If the litigant is able to make the admission, the time for making it is during discovery procedures, and not at the trial." (*Cembrook v. Superior Court In and For City and County of San Francisco* (1961) 56 Cal.2d 423, 429.)

"If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay *the reasonable expenses incurred in making that proof*, including reasonable attorney's fees." (Code Civ. Proc., § 2033.420, subd. (a), italics added.) The trial court must make such an order "unless it finds any of the following: [¶] (1) An objection to the request was sustained or a response to it was waived under Section 2033.290. [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit."[20] (Code Civ. Proc., § 2033.420, subd. (b).)

"[W]here it becomes clear from evidence introduced by either party at trial that the party who denied for lack of information or belief had access to the information at the time requests for admissions were propounded, sanctions are justified because that party has a duty to investigate (*Lindgren v. Superior Court*, *supra*, 237 Cal.App.2d 743, 746; *Chodos v. Superior Court*, *supra*, 215 Cal.App.2d 318, 323)." (*Smith v. Circle P Ranch Co.*, *supra*, 87 Cal.App.3d at p. 275.)

---

[20]  "An issue is of 'substantial importance' if it has 'at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case.' (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 509 . . . fn. omitted.)" (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634-635 [former Code Civ. Proc., § 2033, subd. (o)].)

"The determination of whether 'there were no good reasons for the denial,' whether the requested admission was 'of substantial importance,' and the amount of expenses to be awarded, if any, are all within the sound discretion of the trial court. [Citation.]" (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 508 [former Code Civ. Proc., § 2034, subd. (c)].) "An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972 . . . .) It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is reasonable. (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 882 . . .)" (*Stul v. Sparrow* (2001) 92 Cal.App.4th 860, 864.)

C. *No Abuse of Discretion*

The Bloxhams now argue that the trial court abused its discretion because the Saldingers always knew they were encroaching on their property and they took affirmative steps to produce a false survey. The Bloxhams assert that, at the time of the response, the Saldingers did not have a reasonable basis for denying the request for admission. Jensen's 2007 survey was already completed and the Saldingers had not yet consulted a surveyor who reached a substantially different result.

The Bloxhams have not shown that Barbara Saldinger failed to make a reasonable investigation to ascertain the accuracy of the Bloxhams' deed description. Although the Bloxhams now question the truth of Todd Saldinger's 2009 deposition testimony that the Saldingers walked the property line with Lynne Tinel (the prior owner of their property) because Tinel stated in her 2009 deposition testimony that she did not remember doing so, Tinel's deposition testimony corroborated Todd Saldinger's deposition testimony that Tinel told the Saldingers that the trees were on her property. According to Todd, they did walk the property line with Tinel and they were shown a property line beyond the trees.

28

In any case, the request for admission concerned the legal accuracy of the Bloxhams' grant deed description, not where the Rancho line ground was located on the ground. The Bloxhams' request for admission was not susceptible of an interpretation that the request asked for an admission that the Rancho line was located as indicated in Jensen's 2007 survey.

The Bloxhams merely requested an admission that the common boundary lines between the parties' properties were "accurately described by the plaintiffs' deed." The accuracy of the grant deed's legal description of the property acquired by the Bloxhams was not an issue at trial. Rather, as recognized by the trial court, the decisive issue was the location of the Rancho line on the ground since the relevant deed descriptions called to the Rancho line.

The Saldingers did not, for example, assert that the legal descriptions of parcels contained in the Bloxhams' grant deed were inaccurate under the doctrine of agreed boundaries (see *Bryant v. Blevins* (1994) 9 Cal.4th 47)[21] or a theory of adverse possession (see Civ. Code, § 1007) or because the Saldingers rather than the Bloxhams held the senior rights. The Saldingers acknowledged throughout the trial that Bloxhams' Parcel

---

[21]     "The agreed-boundary doctrine constitutes a firmly established exception to the general rule that accords determinative legal effect to the description of land contained in a deed." (*Bryant v. Blevins*, *supra*, 9 Cal.4th at p. 54.) "Although the agreed-boundary doctrine is well established in California, our case law has recognized that the doctrine properly may be invoked only under carefully specified circumstances. . . . 'The requirements of proof necessary to establish a title by agreed boundary are well settled by the decisions in this state. [Citations.] The doctrine requires that there be [1] an uncertainty as to the true boundary line, [2] an agreement between the coterminous owners fixing the line, and [3] acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position.' (*Ibid*.)" (*Id*. at p. 55.) "[W]hen existing legal records provide a basis for fixing the boundary, there is no justification for inferring, without additional evidence, that the prior owners were uncertain as to the location of the true boundary or that they agreed to fix their common boundary at the location of a fence. [Citations.]" (*Id*. at p. 58.)

Four had senior rights and took precedence over the Saldingers' Parcel Two. Even if the Saldingers' surveyor misapplied senior rights as the Bloxhams assert, there was no challenge to the accuracy of the deed's description of Bloxhams' Parcel Four at trial.[22] At trial, the Saldingers did not dispute that "[t]he boundary lines between plaintiffs' property and defendants' property are *accurately described by the plaintiffs' deed.*" (Italics added.)

In any case, the Bloxhams did not demonstrate that they incurred any cost to prove the correctness of their *deed's description* of common boundaries between the Bloxhams' and the Saldingers' properties. " 'Proof' is the establishment by evidence of a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 190.) The extensive testimony at trial by the Bloxhams' surveyor and surveying expert related to the location of the Rancho line and the resulting location of the common boundaries of the parties' properties on the ground.

The trial court acted within its discretion in denying the Bloxhams' request for a costs of proof award.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.


ELIA, J.


WE CONCUR:

    RUSHING, P. J.

    PREMO, J.

---

[22] A note to Gray's Record of Survey acknowledged the Bloxham's Parcel Four has senior rights.

Trial Court:                    Santa Cruz County Superior Court
                                S.Ct. No. CV159793

Trial Judge:                    Hon. Robert B. Atack
                                Hon. Timothy R. Volkmann



Counsel for Plaintiffs,
Cross-defendants and Appellants:    Redenbacher & Brown
                                    Gary Redenbacher


Counsel for Defendants,
Cross-complainants and Appellants:   Hicks Thomas
                                     Eric Grant
                                     John B. Thomas
                                     Doherty Georgeson
                                     Adamont N. Georgeson

*Bloxham, et al. v. Saldinger, et al.*

H038040